826 F.Supp.2d 478 (2011)
In re REFCO INC. SECURITIES LITIGATION.
This Document Relates to: Kenneth M. Krys, et al., Plaintiffs,
v.
Richard Aaron, et al., Defendants.
Nos. 07 MDL 1902 (JSR), 08 Civ. 7416 (JSR).
United States District Court, S.D. New York.
March 30, 2011.

*487 ORDER

JED S. RAKOFF, District Judge.
On July 19, 2010, Special Master Daniel J. Capra issued a Report and Recommendation in the above-captioned case recommending that the Court adopt the following conclusions:
Count I, Breach of Contract:
 Count I should be dismissed as to Aaron and Castranova, with prejudice.
 The claim that Mellon is liable for breaching the Service Agreement should be dismissed with prejudice.
Count II, Breach of the Covenant of Good Faith and Fair Dealing:
 Count II should be dismissed with prejudice.
Count III, Indemnity:
 Count III should be dismissed as to Mellon, with prejudice.
Count VI, Declaratory Relief:
 Count IV should be dismissed as to Castranova, with prejudice.
Count V, Breach of Fiduciary Duty:
 The DPM entities' motion to dismiss should be denied.
 PlusFunds' claim against Aaron should be dismissed, with prejudice.
 Aaron's motion to dismiss SMFF's claim should be denied.
 Count V should be dismissed as to Castranova, with prejudice.

*488  Count V should be dismissed as to Mellon, with prejudice.
Count VI, Aiding and Abetting Breach of Fiduciary Duty:
 The motions to dismiss should be denied with respect to all Defendants except Mellon.
 Count VI should be dismissed as to Mellon, with prejudice.
Count VII, Interference with Contract/Prospective Contract:
 Count VII should be dismissed with prejudice.
Count VIII, Fraud/Misrepresentation:
 The motions to dismiss should be denied with respect to all Defendants except Mellon.
 Count VII should be dismissed as to Mellon, with prejudice.
Count IX, Aiding and Abetting Interference with Contract/Prospective Contract:
 Count IX should be dismissed with prejudice.
Count X, NJRICO:
 Count X should be dismissed with prejudice.
See 07/19/10 R & R at 62-64.
After the various parties timely submitted objections to the Special Master's recommendations and responses to those objections, the Court heard oral argument on October 28, 2010. Having now reviewed the matter de novo, the Court finds itself fully persuaded by the Special Master's typically comprehensive and well-reasoned Report and Recommendation and hereby adopts it in full as if incorporated herein.
Finding nothing to add to the Special Master's excellent Report and Recommendation, the Court hereby affirms and adopts in all respects the conclusions set forth above.
SO ORDERED.

REPORT AND RECOMMENDATION OF THE SPECIAL MASTER ON MOTIONS TO DISMISS
DANIEL J. CAPRA, Special Master.
The defendants in this action move to dismiss almost all the counts in the complaint against them arising from losses suffered when assets were allegedly transferred from segregated accounts at Refco LLC to unprotected accounts at Refco Capital Markets, Ltd. ("RCM"). According to the First Amended Complaint, this action is brought to recover (i) $263 million plus interest in damages suffered by the SPhinX family of hedge funds ("SPhinX"); (ii) the lost business enterprise value and deepening insolvency damages suffered by SPhinX's investment manager, PlusFunds Group, Inc., ("PlusFunds"); and (iii) damages suffered by the Assignors, a group comprised of SPhinX investors. First Amended Complaint ("FAC") ¶ 1. The gravamen of the complaint is that SPhinX's excess cash was diverted "from protected, customer segregated accounts to unprotected offshore accounts, where those assets were ultimately lost in the Refco scandal." Id.[1]

I. Introduction

A. The Parties
There are three sets of claimants:
*489 1. The SPhinX family of funds, organized under Cayman Islands law, entered into voluntary liquidation after the fall of Refco. Plaintiffs Kenneth M. Krys and Margot MacInnis are their Joint Official Liquidators.[2]
2. Plaintiff The Harbor Trust Co. Ltd. is the Trustee of the SPhinX Trust.[3] The SPhinX Trust is the assignee of claims from the estate of PlusFunds. PlusFunds created SPhinX and served as its investment manager.
3. Mr. Krys and Ms MacInnis are also pursuing claims that have been assigned by sixteen entities that were SPhinX Funds investors. These claims will be referred to as "Investors' claims" or "Assignors' claims."

B. The Standing Opinion
In an Order dated March 31, 2010, Judge Rakoff adopted the conclusions in a Report and Recommendation of the Special Master regarding issues of standing. Insofar as relevant here, that Order provides the following:
1. All claims brought by the Assignors have been dismissed with prejudice for lack of standing, because they replicate claims brought by SPhinX.
2. All claims brought by any SPhinX entities other than SPhinX Managed Futures Fund ("SMFF") have been dismissed with prejudice, because the claims of the other entities are derivative of those pursued by SMFF.[4]
3. The motions to dismiss the claims of PlusFunds on grounds of standing have been denied because PlusFunds is alleging direct injury and damages independent from those of SMFF.

Accordingly, this Report and Recommendation will consider the instant motions to dismiss only insofar as they involve SMFF and PlusFunds.

C. The Defendants
1. Derivative Portfolio Management LLC (a Delaware company), and Derivative Portfolio Management Ltd. (a Cayman Islands entity) together served as SPhinX's administrator pursuant to a Service Agreement. The assets and liabilities of both entities were acquired in 2005 by Mellon Financial Corporation, after which they were operated respectively as DPM-Mellon LLC, a Delaware limited liability *490 company, and DPM-Mellon Ltd., a Cayman Islands entity (collectively, "DPM-Mellon"). After the acquisitions, DPM-Mellon served as SPhinX's administrator pursuant to the Service Agreement. This Report and Recommendation will refer to all the DPM and DPM-Mellon entities collectively as "DPM." or "the DPM entities."
2. Bank of New York Mellon Corporation f/k/a Mellon Financial Corporation ("Mellon"), a Delaware corporation, allegedly "controlled DPM-Mellon" (FAC ¶ 35) and is assertedly liable for the acts and omissions of DPM.
3. Robert Aaron was a director of SPhinX from 2002 to 2006 and was the founder, Chief Executive Officer, part owner and member of the board of directors of DPM "at all times relevant." FAC ¶ 38.
4. Guy Castranova was President, Chief Operating Officer, part-owner and member of the board of directors of DPM "at all times relevant." FAC ¶ 39. Aaron and Castranova will from time to time be referred to as "the Individual Defendants."[5]

D. Facts Forming the Basis of the Complaint
The gravamen of the complaint is that SMFF excess cash in segregated accounts at Refco LLC werewithout authorizationswept into commingled accounts at RCM and ultimately lost in the Refco scandal because they were not protected from RCM's insolvency. The basic allegations in the First Amended Complaint specific to the Defendants can be summarized as follows:
1. SMFF entered into an Investment Management Agreement (IMA) with PlusFunds, under which PlusFunds was the exclusive investment manager for SMFF. FAC ¶¶ 86-88. PlusFunds retained Refco LLC to provide execution, clearing and margin services. FAC ¶ 95. SMFF funds at Refco LLC were protected in the event of Refco LLC's insolvency. FAC ¶ 97.
2. PlusFunds engaged DPM to serve as administrator for the SPhinX funds. The relationship among SPhinX, PlusFunds, and DPM was governed by a Service Agreement dated July 9, 2002, and amended on May 1, 2003 and June 30, 2004 (collectively, the "Service Agreement"). FAC 1103. The Service Agreement required DPM to perform all services necessary for administration and reconciliation of the SPhinX funds, including but not limited to providing: daily activity reports; daily reconciliations; daily and monthly valuations and NAV reports; reconciliations of marketable instruments, cash and security positions; monthly reports, including gains and losses, accrued dividend and interest analysis; market and credit risk reports; corporate secretarial functions; and quarterly, unaudited financial statements. FAC ¶ 107. The Service Agreement required DPM to perform treasury functions including investment of excess cash. FAC ¶ 115.[6]
3. Aaron, Castranova, and DPM knew that most of SMFF's excess cash was being swept into RCM and thus exposed to loss. They also knew that innocents at *491 PlusFunds were unaware that the excess cash was unprotected. FAC ¶ 153.
4. The First Amended Complaint alleges that Aaron signed a letter on behalf of SPhinX that allowed SMFF excess cash at Refco LLC to be transferred to RCM. FAC ¶¶ 130-132. But the Plaintiffs have since backed off from that allegation. The Plaintiffs now concede that the so-called "Aaron letter" does not authorize the transfer of excess cash to RCM. See Plaintiffs' Memorandum in Opposition to Motion to Dismiss by DPM Defendants at 27; Transcript of Oral Argument at 114, Statement of Plaintiffs' counsel ("When you read the letter it was for margin money, it was not what would go to RCM"). The Plaintiffs still assert, however that Aaron failed to assure the segregation of SMFF's excess cash. FAC ¶ 249; Transcript of Oral Argument at 115 ("the $312 million... has nothing to do with the July 31st letter and we allege it separately").
5. Each of the Defendants authorized and facilitated the movement of SMFF cash to unprotected accounts at RCM. FAC ¶¶ 270-71.
6. DPM in its weekly risk reports misstated and/or omitted the fact that SMFF excess cash was at risk in unprotected accounts. See, e.g., FAC ¶ 337. Also, various statements in SPhinX offering memoranda, marketing materials, and financial statements misrepresented the fact that the excess cash was at risk and Aaron, Castranova and DPM helped to prepare all of these materials. FAC ¶¶ 380-388.
7. Mellon exercised control over DPM-Mellon, promised to bring DPM's performance "up to Mellon standards," and assumed each and every contractual and fiduciary duty owed by DPM to PlusFunds and SMFF. FAC ¶¶ 293-95.

E. The Right to Have the SMFF Funds Maintained in a Segregated Account
The founding premise for most of the Plaintiffs' claims is that SMFF's excess cash was wrongfully transferred from segregated accounts at Refco LLC to commingled accounts at RCM. The Defendants in this action and in Krys v. Sugrue have argued that the Plaintiffs' basic premise is faulty on a number of grounds, including: 1) there was no right to have the excess cash in a segregated account; 2) the transfers to RCM were authorized by PlusFunds and SPhinX; and 3) the Plaintiffs are precluded from arguing for a right to segregation by Judge Drain's ruling in the Refco bankruptcy proceeding.
In a Report and Recommendation dated March 1, 2010, entered in Krys v. Sugrue, the Special Master recommended among other things that the Court rule that 1) the Plaintiffs have sufficiently alleged that SMFF had a right to have its excess cash segregated in accounts at Refco LLC; and 2) the Plaintiffs are not precluded by Judge Drain's ruling and have sufficiently alleged that the transfer of SMFF excess cash from Refco LLC to RCM was unauthorized and wrongful. Objections to that Report and Recommendation have been filed with the Court and the Court has heard argument on those objections.
The Court's ruling on the Special Master's Recommendations will have an impact on most of the counts in the Amended Complaint in the instant case. For purposes of the instant Report and Recommendation, it will be assumed that the Plaintiffs have sufficiently alleged that SMFF had a right to have its excess cash segregated in accounts at Refco LLC and that the transfer to RCM was unauthorized and wrongful. If the Court in Krys v. Sugrue rejects the Special Master's recommendations on the segregation question, then the Special Master will issue a *492 new R and R to assess the impact of that ruling in the instant case.

F. Wagoner Issues
As in Krys v. Sugrue, the Defendants in this actionspecifically in Aaron's briefs argue that most of the Plaintiffs' claims should be dismissed under the Wagoner/in pari delicto doctrine because the Plaintiffs stand in the shoes of wrongdoers. See Shearson Lehman Hutton, Inc. v. Wagoner, 944 F.2d 114 (2d Cir.1991). The effect of Wagoner is one of the "omnibus" issues that affects almost all of the claims brought by these Plaintiffs in this action as well as in Krys v. Sugrue and Krys v. Butt. The contours of the Wagoner defense are currently being considered by the New York Court of Appeals on certification of questions from the Second Circuit. See Kirschner v. KPMG LLP, 13 N.Y.3d 933, 922 N.E.2d 898, 895 N.Y.S.2d 309 (2010).
This Report and Recommendation will not consider Wagoner issuesthey will be considered if necessary at a later point in accordance with the sequencing established for omnibus issues.

II. Standards on a Motion to Dismiss
The legal standards for evaluating a pleading on a motion to dismiss are as follows:
1) The Plaintiff need not establish that he will ultimately prevail. The question is whether the Plaintiff is entitled to obtain discovery and offer evidence to support his claim. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 476 (2d Cir.2006).
2) "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, `to state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 [(2009)], quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). If the Plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [his] complaint must be dismissed." Twombly, 550 U.S. at 547[, 127 S.Ct. 1955].
3) Claims sounding in fraud must be "stated with particularity." Fed. R.Civ.P. 9(b). "The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994). The Plaintiff must specifically describe the acts or statements alleged to be fraudulent and provide some factual basis that creates a plausible inference of fraudulent intent.
4) Under Rule 9(b), a plaintiff pleading fraud based on deceptive conduct "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on [plaintiffs]." In re Parmalat Sec. Litig., 383 F.Supp.2d 616, 622 (S.D.N.Y.2006). As the Second Circuit has stated:
Although malice, intent, knowledge and other condition of mind of a person may be averred generally, this leeway is not a license to base claims of fraud on speculation and conclusory allegations. Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *493 Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir.2004) (internal citations omitted); see also In re Agape Litigation, [681 F.Supp.2d 352, 361-62], 2010 WL 335621 at *6 (E.D.N.Y.[2010]) (same).

III. Review of Counts in the Complaint

A. Count IBreach of Contract (Against All Defendants).
The Plaintiffs allege that each of the Defendants breached the Service Agreement by: 1) placing SMFF's cashor allowing it to be placedin unprotected accounts at RCM; 2) failing to produce accurate and timely NAV's and reconciliations; 3) failing to produce accurate financial statements; 4) failing to reconcile all cash and securities positions; and 5) failing to provide accurate credit and risk reporting.[7]
In addition, the Plaintiffs claim that DPM-Mellon and Mellon entered into a contract in 2006 with the JOLs to maintain SPhinX assets in Mellon accounts at a market rate of interest, but that those defendants breached the agreement by failing to provide interest on SPhinX assets from January to June 2007.
The DPM entities do not move to dismiss Count I.[8] Mellon, however, does move to dismiss the breach of contract claim insofar as it seeks relief against it for breach of the Service Agreement. (It does not move to dismiss the claim against it relating to the 2006 contract). In addition, both Aaron and Castranova move to dismiss Count I.
The ground for dismissing Count I as to the individual defendants is simply stated: they were not parties to the Service Agreement, so they argue that they cannot be liable for breaching it. The Plaintiffs claim that the Service Agreement imposed contractual obligations on the Individual Defendants due to their roles as officers and agents of DPM. (FAC ¶ 301). But the Plaintiffs provide no legal theories or case law to support this allegation. Nor do they respond to the arguments by the Individual Defendants regarding the inadequacy of the breach of contract claims against them. Notably, the Plaintiffs' proposed Second Amended Complaint removes the Individual Defendants from the breach of contract claim.
The Plaintiffs' failure to seriously contest the motion to dismiss the Individual Defendants from Count I is sufficient to warrant granting the motion. At any rate, the Service Agreement specifically provides that the contract is between DPM and the SPhinX entities, and there is no evidence that either Aaron or Castranova purported to bind himself individually to the Agreement. Acting only as agents for DPM, Aaron and Castranova each signed above the reference to their corporate office. Thus, Aaron and Castranova cannot be personally liable for breach of the Service Agreement. See, e.g., Metropolitan Switch Bd. Co., Inc. v. Amici Associates, Inc., 20 A.D.3d 455, 799 N.Y.S.2d 531, 531-32 (2d Dept.2005) (individual defendants not liable for breach of contract where they executed the contract solely in their capacities as corporate officers).
With respect to the claim against Mellon for breach of the Service Agreement, the Plaintiffs claim that Mellon assumed *494 DPM's contractual obligations under that Agreement. (FAC ¶ 302). But the Plaintiffs provide little case law to support their position and it is difficult to understand what legal theories they rely on. First, the Plaintiffs contend that Mellon assumed contractual obligations under the Agreement when it purchased DPM's assets and liabilities. The Plaintiffs also set forth "allegations with respect to the corporate history of the DPM entities and its officers, directors, and shareholders; the date of the transaction at issue; the parties to and participants in the transaction; the amount of the transaction; and, after the transaction, Mellon's direct involvement with DPM's former business." Letter from Plaintiffs' Counsel to Special Master dated Feb. 8, 2010, at 1. Second, the Plaintiffs assert that Mellon's agents promised PlusFunds and SPhinX that DPM's subpar performance under the Service Agreement would be "brought up to Mellon standards." FAC ¶ 293. The Plaintiffs contend that under Rule 8(a) these allegations collectively are sufficient to show that Mellon is liable under the Service Agreement.
"Under New York law, contracts are freely assignable absent language which expressly prohibits assignment." Corbett v. Firstline Security, Inc., 687 F.Supp.2d 124, 129 (E.D.N.Y.2009) (internal quotation omitted). However, in the instant case, the Service Agreement is not freely assignable because it expressly prohibits assignment without written consent. The Service Agreement provides:[9]
This Agreement shall be binding on and inure to the benefit of the respective parties hereto and their heirs, executors, successors and assigns. No party shall assign the rights or delegate the duties pursuant to this Agreement without the prior written consent of the other parties.
Service Agreement § 22. There is nothing in the Amended Complaint alleging that written consent was obtained to assign Mellon the rights and duties pursuant to the Service Agreement.
Even if the Service Agreement had been assigned to Mellon, the Plaintiffs would still fail to establish Mellon's contractual liability. New York courts hold that even if an agreement purports to bind successors and assigns of the parties to the agreement, "an assignee or successor will not be bound to the terms of a contract absent an affirmative assumption of the duties under the contract." Amalgamated Transit Union Local 1181, AFL-CIO v. City of New York, 45 A.D.3d 788, 790, 846 N.Y.S.2d 336 (2d Dept.2007) (citing cases); see also IMG Fragrance Brands, LLC v. Houbigant, Inc., 679 F.Supp.2d 395, 404-05 (S.D.N.Y.2009) (express assumption required under New York law). In addition, absent an agreement to the contrary, "the mere assignment of a contract is an assignment of the rights in the contract and not of the assignor's duties and liabilities incurred prior to the assignment." A.C. Associates v. American Bridge Division of U.S. Steel Corp., 1989 WL 1111034, at *1 (S.D.N.Y.). Again, there is nothing in the Amended Complaint to support an inference that Mellon expressly assumed *495 DPM's duties and/or liabilities under the Service Agreement.
Plaintiffs rely heavily on Mellon's asserted promise to bring DPM's performance up to "Mellon standards." But mere participation or support in the performance of a contract does not constitute assumption. See Mellencamp v. Riva Music Ltd., 698 F.Supp. 1154, 1160 (S.D.N.Y.1988) (finding no authority to support the plaintiffs assertion that "defendants may be liable for the breach of a contract which they are strangers to simply because they share the same director and/or owner as the other corporate defendants or because they assisted the other corporate defendants in the [administration of the contracts].").
While they do not come out and say it, the Plaintiffs rely in the end on a lack of separate corporate identity between Mellon and DPMthey want to pierce the corporate veil. It is axiomatic that, "[p]arent and subsidiary or affiliated corporations are, as a rule, treated separately and independently so that one will not be held liable for the contractual obligations of the other absent a demonstration that there was an exercise of complete dominion and control but evidence of domination alone does not suffice without an additional showing that it led to inequity, fraud or malfeasance." Sheridan Broadcasting Corp. v. Small, 19 A.D.3d 331, 332, 798 N.Y.S.2d 45 (1st Dept.2005). In considering whether a corporation exercised "complete domination" over a related entity, courts consider such factors as:
(1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms' length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.
IMG Fragrance Brands, LLC v. Houbigant, Inc., supra, 679 F.Supp.2d at 403-05. The Plaintiffs' allegations in the Complaint do not come close to contending that Mellon exercised "complete domination" over DPM under the above case law. Certainly the fact that Mellon appointed a majority of board members of DPM-Mellon is not sufficient to establish "complete domination." See United States v. Bestfoods, Inc., 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43, 61-62 (1998) (noting that "it is hornbook law that `the exercise of the `control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That `control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal.'") (quoting Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193, 196 (1929)).
The proposed Second Amended Complaint adds certain allegations about Mellon's relationship to DPM after the acquisition. But there is not enough to indicate that the once-amended Complaint could be amplified to add plausible factual allegations 1) that Mellon affirmatively assumed the obligations of the Service Agreement or 2) that Mellon exercised "complete dominion" over DPM. The allegations of the proposed Second Amended Complaint do not come close to providing sufficient factual assertions on either of these points. See, e.g., Kropelnicki v. Siegel, 290 F.3d 118, 130-131 (2d Cir.2002) (court considers *496 proposed amended complaint in deciding whether leave to amend should have been granted).

Recommendations:

1. Count I should be dismissed as to Aaron and Castranova, with prejudice.

2. The claim that Mellon is liable for breaching the Service Agreement should be dismissed with prejudice.

B. Count IIBreach of the Covenant of Good Faith and Fair Dealing (Against All Defendants)
The Plaintiffs allege that, "[t]he Service Agreement, like all contracts, included implied mutual covenants of good faith and fair dealing, whereby each party agrees to refrain from behavior that would prevent any other party from enjoying rights due under the Service Agreement." (FAC ¶ 314).
Each of the Defendants move to dismiss Count II in its entirety. The positions of the respective Defendants, and thus their arguments, differ. Those defendants who were not parties to the Service Agreement argue that because they did not breach the Service Agreement they could not possibly breach a covenant of good faith and fair dealing. That argument is meritorious and dispositive as to Aaron, Castranova, and Mellon. See Cyber Media Group, Inc. v. Island Mortgage Network, Inc., 183 F.Supp.2d 559, 582 (E.D.N.Y.2002):
New York common law supports the proposition that no covenant of good faith and fair dealing arises in the absence of a contract. American-European Art Assocs., Inc. v. Trend Galleries, Inc., 227 A.D.2d 170, 171, 641 N.Y.S.2d 835 (1st Dept.1996). Where, as here, Plaintiffs and Defendants have not entered into any contract * * * Plaintiffs cannot sustain a cause of action based on a breach of the covenant of good faith and fair dealing.
Accordingly, the claims in Count II against Aaron, Castranova and Mellon should be dismissed with prejudice.
The DPM entitieswho were of course parties to the Service Agreement argue that the Plaintiffs' claim for breach of the covenant of good faith and fair dealing must be dismissed because it does nothing but duplicate the breach of contract claim. The Plaintiffs respond that the claim should not be dismissed, because "at this early stage, it is possible that duties that are not explicitly defined in the Service Agreement may need to be implied." Brief in Opposition to the Motion to Dismiss at 8. The Plaintiffs posit that the court might find that the Service Agreement does not explicitly set parameters on DPM's duties with respect to "investment of excess cash."
Under New York law, a claim for breach of the implied covenant can survive a motion to dismiss only "if it is based on allegations different than those underlying the accompanying breach of contract claim" and if the relief sought is not "intrinsically tied to the damages allegedly resulting from the breach of contract." ARI and Co., Inc. v. Regent Intern. Corp., 273 F.Supp.2d 518, 521-22 (S.D.N.Y.2003) (internal citations and quotations omitted). See also Harris v. Provident Life and Acc. Ins. Co., 310 F.3d 73, 81 (2d Cir.2002) ("New York law * * * does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").
In ARI and Co., supra, the plaintiff was hired as a sales representative for the defendant, a manufacturer and distributor of clothing. The claim for breach of the implied covenant rested on the allegation *497 that the defendant unlawfully terminated the Agreement in order to benefit from the plaintiffs contacts in the clothing industry and to avoid paying commissions. The court held that this assertion was almost identical to that contained in the breach of contract claims, which alleged that the defendant unlawfully terminated the Agreement and failed to pay commissions owed to the plaintiff. As a result, the court dismissed the breach of the implied covenant claim as duplicative of the breach of contract claim. Similarly, in the instant case, the claim for a breach of the implied covenant must be dismissed as duplicative of the Plaintiffs' breach of contract claim.
The Plaintiffs rely on three cases, but none of the cases are on point. Two of the casesPension Committee of University of Montreal Pension Plan v. Banc of America Sees., LLC, 446 F.Supp.2d 163, 199 (S.D.N.Y.2006), and in In re Allou Distributors, Inc., 387 B.R. 365, 412 (E.D.N.Y.2008)do not involve claims for breach of the covenant of good faith and fair dealing. They make only general comments that plaintiffs are allowed to proceed on multiple theories. In the third case, Bakerman v. Sidney Frank Importing Co., Inc., 2006 WL 3927242, at *20 (Del.Ch.), the court stated that the plaintiff "may, after discovery, be able to show some independent breach of the duty of good faith and fair dealing that falls outside the ambit of previously pled breaches and so declined to dismiss the claim. But even if a Delaware case has any bearing on the subject, the Bakerman court recognized that the implied covenant of good faith and fair dealing is operative only when it is "clear from what was expressly agreed upon that the parties who negotiated the express terms of the contract would have agreed to proscribe the act later complained of as a breach of the implied covenant of good faith had they thought to negotiate with respect to that matter." Id. In other words, the implied covenant applies when the spirit, if not the letter of the contract was violated. In this case, the Amended Complaint belies the possibility of a violation of the spirit rather than the letter of the Service Agreement. The Complaint lays out the detailed obligations that DPM had under the service agreement. See FAC ¶¶ 108-118. The litany of alleged failings in performing the contractual obligation is also set forth in detail. See FAC ¶¶ 272-279. There is no allegation that any of the listed failings is somehow outside the terms of the contract.
The Plaintiffs assert the possibility that duties that are not explicitly defined in the Service Agreement may need to be implied. But New York law provides that "[a] claim for breach of the implied covenant will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." ICD Holdings S.A. v. Frankel, 976 F.Supp. 234, 243-44 (S.D.N.Y.1997). See also Wolff v. Rare Medium, Inc., 171 F.Supp.2d 354, 360 (S.D.N.Y.2001) ("Plaintiffs' allegation of a breach of the obligation of good faith is duplicative of the cause of action for breach of contract since New York courts generally assume an obligation of good faith and fair dealing between parties to a contract."). Accordingly, the Plaintiffs have failed to pleadand cannot pleada cause of action for violation of the implied covenant of good faith and fair dealing.

Recommendation: Count II should be dismissed in its entirety, with prejudice.

C. Count IIIIndemnity (Against DPM entities and Mellon)
The Service Agreement includes the following indemnity provision:

*498 DPM and DPM Ltd. agree to indemnify and hold harmless the Companies and the Portfolio Fund Series and their officers and employees and their respective successors and permitted assigns from and against any and all liabilities, claims, costs, fines, damages, expenses, losses and attorneys' fees arising out of or in connection with any failure of DPM or DPM Ltd. to perform their obligations hereunder ...
(FAC ¶ 321; Service Agreement § 18). The Plaintiffs claim that the losses suffered by SMFF were caused by and arose out of the DPM entities' failures to perform their obligations under the Service Agreement. (FAC ¶ 322). The Plaintiffs state that the DPM entities and Mellon are obligated under the Service Agreement to indemnify SMFF for its losses (FAC ¶¶ 323-24).
As this claim is based on the terms of the Service Agreement, its treatment is the same as the breach of contract claim in Count I. As discussed above, the DPM entities do not move to dismiss the contract-related claims (and no specific mention of Count III is made in the DPM briefs). Mellon, however, contests all Service Agreement-related liability on the ground that it was never a party to that agreement and never assumed any obligations thereunder. As discussed above under Count I, the Plaintiffs have not sufficiently pled a claim against Mellon under the Service Agreement. Therefore, Mellon is entitled to dismissal of Count III.

Recommendation: Count III should be dismissed as to Mellon, with prejudice.

D. Count IVDeclaratory Relief (Against DPM, DPM-Mellon, Aaron and Castranova)
In Count IV, the Plaintiffs state that Defendants Aaron and the DPM entities have asserted claims for indemnity under the Service Agreement. (FAC ¶ 326). The Plaintiffs seek a declaration from the Court that Aaron, Castranova and the DPM entities are not entitled to indemnity under the Service Agreement or any other document and that their claims for indemnity are improper and unenforceable. (FAC ¶ 327)
The DPM entities and Aaron do not move to dismiss Count IV. But Castranova moves to dismiss Count IV on the ground that he has not asserted and is not seeking any indemnification. DPM Brief in Support of Motion to Dismiss at 25 (citing Pendleton Decl., Ex. 37, Proof of Debt). The Plaintiffs respond that declaratory relief is proper anyway, because declaratory relief is by definition not dependent on an adverse claim having been brought.
In United States v. Doherty, 786 F.2d 491, 498-99 (2d Cir. 1986), the court described the proper role of declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.:
Essentially, a declaratory relief action brings an issue before the court that otherwise might need to await a coercive action brought by the declaratory relief defendant; the fundamental purpose of the [Declaratory Judgment Act] is to avoid accrual of avoidable damages to one not certain of his rights and to afford him an early adjudication without waiting until his adversary should see fit to begin suit, after damage has accrued.... [T]he declaratory judgment procedure... enables a party who is challenged, threatened or endangered in the enjoyment of what he claims to be his rights, to initiate the proceedings against his tormentor and remove the cloud by an authoritative determination of the plaintiffs legal right, privilege and *499 immunity and the defendant's absence of right, and disability.
(internal quotations and citations omitted)
The Plaintiffs rely on Doherty, but Doherty emphasizes that declaratory relief is available only if there is an actual controversy between the partiesin such a circumstance, a party who would be prejudiced by having to wait to be sued can ask for declaratory relief. In this case, Castranova has unequivocally admitted in his briefs that he is not seeking indemnity under any agreement. Under these circumstances, Castranova will be estopped from bringing any indemnity claimeven assuming that one could be timely brought at this point. Therefore there is no controversy about indemnity with respect to Castranova and declaratory relief is not proper.

Recommendation: Count IV should be dismissed as to Castranova, with prejudice.

E. Count VBreach of Fiduciary Duty (Against All Defendants)
This is the third opportunity for the Special Master to review motions to dismiss breach of fiduciary duty claims in this MDL[10] This case differs at the threshold, however, because the parties do not agree on which law applies to the claims for breach of fiduciary duty. This section treats the choice of law dispute first, and then addresses the viability of breach of fiduciary duty claims as to each of the Defendants.

1. Choice of Law:
This action was originally filed in New Jersey. When an action is transferred as part of a multidistrict litigation, a transferee court applies its own interpretation of federal law, but to the extent that the action involves issues of state law, the choice-of-law rules of the transferor forum govern. In re Parmalat Securities Litigation, 479 F.Supp.2d 332, 340 (S.D.N.Y. 2007). Thus in the first instance, New Jersey's choice-of-law principles govern the applicability of state law claims for breach of fiduciary duty.
The Plaintiffs contend that all of their tort claims are governed by New Jersey law. The Defendants assert that New York Law applies to the breach of fiduciary duty claims to the extent they are derived from obligations in the Service Agreement. The Defendants are correct.
Section 20 of the Service Agreement provides that New York law governs the agreement and all performance thereunder. Under New Jersey law, where a choice-of-law provision in a contract is sufficiently broad to encompass contract-related tort claims, the parties' choice will be honored. For example, in Re-Source America, Inc. v. Corning Inc., 2007 WL 174714, at *5-6 (D.N.J. Jan. 19, 2007), the court held that a choice-of-law provision governed both breach of contract and related tort claims. The court concluded that plaintiffs may not avoid forum selection clauses by "simply pleading non-contractual claims in cases involving the terms of a contract containing the parties' choice of forum." (quoting Crescent Int'l Inc. v. Avatar Communities, Inc., 857 F.2d 943, 945 (3d Cir.1988)). The court's analysis aptly describes the facts of the instant case:

*500 [T]he pleadings indicate that the tort claims alleged arise out of events that transpired during the contractual period. Thus, absent the contractual relationship, [Defendant's] actions would not have occurred. Therefore, the Court holds that the choice of law and forum selection clause applies to [Plaintiffs] tort claims as there "is no evidence suggesting that the [choice of law and forum selection clause] was not intended to apply to all claims growing out of the contractual relationship."
Id.
While the Plaintiffs claim that New Jersey law should apply, it is notable that they cite primarily to New York law in their breach of fiduciary duty analysis. And at any rate, the parties do not indicate that there is any actual conflict between New York and New Jersey law with respect to breach of fiduciary duty.[11] Therefore, New York law should apply to the non-contractual claims of fraud and breach of fiduciary duty. See Schwartz v. Hilton Hotels Corp., 639 F.Supp.2d 467, 471 (D.N.J.2009) ("If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue.").

Aaron's Fiduciary Duty
The parties do not agree on which law applies to determine Aaron's fiduciary duties to SMFF by virtue of being on the SPhinX Board of Directors. Aaron claims that under the "internal affairs doctrine," Cayman law should govern because the SPhinX Funds are organized under the laws of the Cayman Islands and the SMFF Articles of Association are governed by the Companies Law of the Cayman Islands. But Aaron has not established an actual conflict of law between Cayman Islands and New York law with respect to a breach of fiduciary duty claim. Compare Boardman v. Phipps, [1967] 2 A[1]C 46, 47F (U.K.) (under Cayman Islands law, a claim for breach of fiduciary duty requires: (1) a fiduciary duty; (2) a breach of the duty; and (3) a showing that the breach caused a loss to the beneficiary of the duty or resulted in a profit for the fiduciary), with Pension Committee of University of Montreal Pension Plan v. Banc of America Sec, LLC, 591 F.Supp.2d 586, 589-90 (S.D.N.Y.2008) ("The elements of a claim for breach of fiduciary duty under New York law are `breach by a fiduciary ... a knowing participation in the breach, and damages.'"). In fact, Aaron cites both Cayman Islands and New York for the proposition that both require a showing of proximate cause. Compare Target Holdings Ltd. v. Redferns, (No. 1) [1996] 1 AC 421, 432 G (U.K.) (Cayman Island law requires that the defendant's conduct proximately caused the plaintiffs alleged loss), with LNC Invs., Inc. v. First Fidelity Bank, 173 F.3d 454, 465 (2d Cir.1999) (New York law requires that the plaintiff demonstrate that the defendant's conduct proximately caused injury in order to establish liability). Because there is no actual conflict of law, New York law governs the claims for breach of fiduciary duty against Aaron arising from his position on the Board. "In the absence of substantive difference ... a New York court will dispense *501 with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it." International Bus. Mack Corp. v. Liberty Mut. Ins. Co., 363 F.3d 137, 143 (2d Cir.2004).
The Plaintiffs also claim that Aaron owed a fiduciary duty to PlusFunds. This claim arises out of the Service Agreement, and for the reasons expressed above New York law controls.

Vicarious Liability of DPM for Aaron's Actions as a SPhinX Director
DPM Defendants claim that under the internal affairs doctrine, Cayman Islands law governs whether DPM is vicariously liable for Aaron's actions as a SPhinX director. The choice of law is potentially important because there is at least arguably a difference between Cayman and New Jersey and New York law on the subject of vicarious liability for the acts of a director appointed by a company to represent its interests on another company. In the Cayman case of Paget-Brown & Co. b. Omni Sees. [1999] CILR 184, a Cayman company (appellant) that offered services to overseas companies entered into a contract with another company (respondent). Under the contract, appellant agreed to provide a person to act as a company director for respondent. This director could have been removed by respondents' shareholders but wasn't. The court found that appellant was not vicariously liable for the director's actions; it reasoned that there was no control by the appellant over the director's performance. That holding is arguably in tension with the basic principle of vicarious liability for the acts of a director appointed by another corporation to represent its interests that would apply under New Jersey and New York law. See, e.g., Montreal Pension Plan, supra, 446 F.Supp.2d at 189 (holding knowledge gained while acting as a director may be imputed to a fund administrator because the director sat on the board in furtherance of their duties on behalf of the administrator). See also In re Sunbeam Securities Litig., 89 F.Supp.2d 1326, 1340 (S.D.Fla.1999) ("While Sunbeam is correct that not all acts of a corporation's officers can be attributed to the corporation, courts have uniformly held that the acts of a corporate officer that are intended to benefit a corporation to the detriment of outsiders are properly imputed to the corporation.").[12]
The internal affairs doctrine "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholdersbecause otherwise a corporation could be faced with conflicting demands." Edgar v. MITE Corp., 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). But the internal affairs doctrine is not directly applicable here because the question is not about the internal affairs of a single corporation (for example, the duties owed by a director to a shareholder or to the corporation itself) but rather about the relationship between two unrelated entities, DPM and SPhinX, connected by the appointment of a director. In the words of Edgar, supra, this case does not involve the relationship "among or between" the *502 corporation (i.e., DPM) and its current directors.
The Plaintiffs do not contest the DPM Defendants' reading of Cayman law on vicarious liability. But they argue that New Jersey law governs whether DPM is vicariously liable for the alleged breach of Aaron's fiduciary duty as a SPhinX director, as no significant events occurred in the Cayman Islands. They note that in Montreal Pension Plan, supra, 446 F.Supp.2d at 191-95a case involving analogous issues of agency and tort law the court declined to apply British Virgin Islands law under the internal affairs doctrine and instead applied New York law under an "interest analysis" because New York was the jurisdiction where the tort occurred. In Montreal Pension Plan, Judge Scheindlin concluded that there was no reason to apply the internal affairs doctrine where the Funds were defunct, the directors no longer served on their boards, and the allegedly tortious conduct of the Directors in relation to the management of the Funds had little more than a nominal connection to the BVI. The same basic factors apply here.
The New Jersey Supreme Court applies the "significant relationship test" for choice of law questions. P.V. ex rel. T.V. v. Camp Jaycee, 197 N.J. 132, 962 A.2d 453 (2008). If an actual conflict exists, the significant relationship test presumes that the law of the place of injury should govern, unless another state has a more significant relationship. Buccilli v. National R.R. Passenger Corp., 2010 WL 624113, at *2 (D.N.J.). In this case, the injuries are most logically placed in New Jersey and New York, and definitely not in the Cayman Islands.[13] Board meetings occurred in New York. Aaron's actions were located in New Jersey. Nothing important happened in the Cayman Islands. Nor is there an overriding interest of the Cayman Islands at stakebecause imposing vicarious liability in this case does not involve regulating the internal affairs of a Cayman Islands entity. Therefore, because Cayman Islands law does not apply, and because there is no cited conflict between New York and New Jersey law, the Special Master will apply New York law and recommends that DPM be found vicariously liable for the acts of Aaron and specifically for any breach of fiduciary duty on Aaron's part that the Plaintiffs have sufficiently pled.[14]

2. Standards for a Breach of Fiduciary Duty Claim Under New York Law
As discussed in previous R and Rs, the New York law on breach of fiduciary duty is broad, vague, and not very helpful in determining whether any particular relationship rises to the level of "fiduciary." It is often stated that a fiduciary relationship "may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge, but an arms-length business relationship does not give rise to a fiduciary obligation." WIT Holding Corp. v. Klein, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dept.2001). "Broadly stated, a fiduciary relationship is one *503 founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another." Penato v. George, 52 A.D.2d 939, 383 N.Y.S.2d 900, 904-5 (2d Dept.1976).

3. Breach of Fiduciary Claims Against DPM
Plaintiffs allege that DPM had a fiduciary duty to SPhinX and PlusFunds based on a relationship of trust and confidence. Under New York law, a fiduciary duty arises if "confidence is reposed on one side and there is resulting superiority and influence on the other." United States v. Chestman, 947 F.2d 551, 568 (2d Cir.1991) (internal quotation omitted). See also Daly v. Metropolitan Life Ins. Co., 4 Misc.3d 887, 782 N.Y.S.2d 530, 535 (Sup. Ct.N.Y.Co.1992) ("[A] fiduciary duty arises, even in a commercial transaction, where one party reposed trust and confidence in another who exercises discretionary functions for the party's benefit or possesses superior expertise on which the party relied.") (internal quotation omitted).
The Plaintiffs seek to establish a relationship of trust and confidence in DPM by virtue of DPM's role as SPhinX's administrator and DPM's detailed responsibilities under the Service Agreement. (FAC ¶¶ 332-33). The Plaintiffs claim that it was DPM's responsibility to protect SPhinX's assets, oversee the investment of SMFF's cash, ensure segregation of funds, and perform services necessary for administration and reconciliation of the SPhinX Funds, including recordkeeping, accounting, financial reporting, and cash management functions. (FAC ¶¶ 20, 103, 105, 107, 265, 332-33, 338). Further, the Plaintiffs allege DPM did much more than merely make ministerial transfers of cash; they claim that DPM authorized those transactions (or purported to authorize them), an act that "inherently involves the exercise of discretion." (Memorandum in Opposition to Motion to Dismiss at 12-13, citing FAC ¶¶ 23, 105, 106, 266, 270-71, 331). In addition, the Plaintiffs allege that DPM, through Castranova, was a signatory on SPhinX's accounts. FAC ¶¶ 23, 331.
Finally, the Plaintiffs allege that DPM owed fiduciary duties because it had the contractual right and obligation to appoint a SPhinX director and therefore had a fiduciary duty to do so in a way that would promote SPhinX's interests. The Plaintiffs allege that DPM thus owed "fiduciary duties by virtue of Aaron's role as DPM's representative on SPhinX's board of directors." (FAC ¶ 330).
According to the Complaint, DPM knew that SPhinX and PlusFunds relied upon it to fulfill its delegated responsibilities. First, DPM's role required DPM to understand SPhinX's business plan and objectives. Second, DPM allegedly signed off on SPhinX's offering memoranda, each of which identified DPM as administrator and discussed the customer segregation requirements. Third, the Service Agreement expressly required DPM to review the Funds' subscription documents. (FAC ¶¶ 269, 336).
The Plaintiffs allege that DPM breached fiduciary duties by, among other things: failing to ensure that SPhinX's assets were maintained in customer segregated accounts; allowing SPhinX's assets to be moved from customer segregated accounts at Refco LLC to unregulated accounts at RCM; failing to disclose that SPhinX's customer assets were at risk; and withholding relevant information regarding the *504 SPhinX Funds' exposure to Refco in the weekly risk summary reports, which misleadingly stated that SPhinX's exposure to Refco was in the range of $10 to $20 million at any given time. (FAC ¶¶ 340-41).[15]
DPM essentially contends that it was little more than a functionary and denies that it exercised any discretionary authority over SMFF's excess cash. This dispute over the extent of DPM's services raises questions of fact. DPM's view of its services rendered does not justify a motion to dismissthe terms of the Service Agreement itself provide substantial support for the Plaintiffs' assertion that DPM exercised important, discretionary functions that go well beyond the "back-office" interpretation offered by DPM. The Service Agreement provides DPM Defendants with accounting, cash management, corporate secretarial, and treasury functions, including the following duties:
 "Generate and distribute on a trade date basis daily activity reports, portfolio summary reports, fund summary reports, realized profit and loss reports, net and gross asset value reports by computing, adjusting, verifying, updating and reconciling data obtained from the Investment Manager (if applicable), Portfolio Managers who invest and trade the assets in the Portfolio Fund Series, futures commission merchants (`FCMs'), prime and executing brokers and counterparties for contracts." (Service Agreement 2(A); FAC ¶ 108).
 "Calculate, adjust, verify, update, reconcile and value security positions ... DPM will monitor all daily price fluctuations. Upon detecting a price or valuation irregularity, DPM will initiate an investigation and either take immediate corrective action or make a request to the Pricing Committee for resolution of a price irregularity." (Service Agreement 2(A.1) & 2(A.1)(e)).
 "Reconcile for readily marketable instruments, all cash and security positions reported by prime brokers and any other brokers where securities are held at another custodial agent." (Service Agreement 2(A.2); FAC ¶ 109).
 "Produce daily NAV's for each share class and each Portfolio Fund Series..." (Service Agreement 2(A.4); FAC ¶ 110).
 "Monthly-Compile and prepare monthly reports of realized and unrealized gain/loss, accrued dividends and interest analysis; calculate monthly net and gross asset value; prepare monthly purchase-sales journal, dividends and interest journal ...; prepare a monthly general ledger accompanied by appropriate documentation including reconciliations and detailed fee schedules; provide trading advisors with monthly balance sheets; and prepare and provide reconciliations to brokers and commodity *505 trading advisors...." (Service Agreement 2(B); FAC ¶ 111).
 "Full reconciliation of all cash and security positions, interest income/expense, dividend accruals reported by prime brokers and any other brokers where securities are held at another custodial agent. At calendar year end, the reconciliation of positions between DPM's records and the prime brokers' records shall be prepared in such a manner to facilitate audit without providing supplementary oral explanation. Reasons for position differences and disposition of those differences should be documented in writing and such documentation shall be made available to the SPhinX entities' auditors...." (Service Agreement 2(B.2); FAC ¶ 112).
 "Produce final NAVS ... Provide market and credit risk reporting ... Maintain records of the general ledger, FCMs' and brokers' statements, trader reports and other relevant reports received." (Service Agreement Section 2(B.3), 2(B.3(C)), 2(B.5(D)); AAC ¶¶ 113-14).
 "Perform treasury functions consisting of the (i) preparation of accounts payable; (ii) signing and distribution of corporate checks; (iii) preparation and delivery of bank deposit forms; (iv) wire transfers of funds as requested by the Investment Manager and the Portfolio Managers; (v) confirmation of income receipts; and (vi) investment of excess cash in the Companies and each of the Portfolio Fund's cash accounts ...." (Service Agreement 2(H), 2(0); FAC ¶ 115) (emphasis added).
 Fulfill one board of director position of the SPhinX Funds. (Service Agreement 2(N); FAC ¶ 116).
 "Prepare complete financial statements... Perform all other services necessary for administration and the reconciliation of all previously mentioned treasury transactions of the Companies." (Service Agreement O; FAC ¶ 117).
 Promptly notify the Companies [SPhinX Funds] of any questions or issues that may arise as to existing or prospective investors or as to any suspicious activity. (Service Agreement 12(j); FAC ¶ 118) (Emphasis added).
By virtue of these extensive obligations, it is plausible to believe that DPM had an extensive role in overseeing the SMFF fundsfar more extensive than the backroom, ministerial role asserted by the DPM Defendants. Accordingly, it is also plausible that the Plaintiffs reposed trust and confidence in DPM and reasonably relied on it for discretionary services. It is true that an arm's-length business relationship does not, without more, establish a fiduciary duty. See, e.g., WIT Holding Corp. v. Klein, 282 A.D.2d 527, 724 N.Y.S.2d 66, 68 (2d Dept.2001). But the allegations in the Complaint about the SPhinX-DPM relationshipreplete with a Board member and discretionary decisions over excess cashat the very least create a question of fact on whether there was more than an arm's-length relationship here.
Other cases in which a fiduciary relationship has been found involve facts that are comparable to, or less compelling, than the facts alleged here. See e.g., Jordan (Bermuda) Inv. Co. v. Hunter Green Invs., Ltd., 2003 WL 21263544, at *4 (S.D.N.Y.) (holding that fund administrator had "a fiduciary duty to all Fund shareholders to implement all trades on behalf of those shareholders and to report the status of each shareholder's account accurately"); Ross v. FSG PrivatAir, Inc., 2004 WL 1837366, at *5 (S.D.N.Y.) (allegations that defendant "held itself out to be expert in aircraft sales and acquisitions, including without limitation, in negotiating contracts *506 for the purchase and sale of aircraft," and that plaintiff "relied on those representations sufficient to allege a fiduciary relationship"). See also EBC I, Inc. v. Goldman Sachs & Co., 5 N.Y.3d 11, 799 N.Y.S.2d 170, 176-7, 832 N.E.2d 26 (2005), where the issuer of newly offered stock alleged that it had relied on the underwriter's expertise with respect to an IPO; the issuer further alleged that the underwriter failed to disclose a kick-back scheme that gave the underwriter an incentive to advise the issuer to undervalue its stock. The Court of Appeals found that the issuer had properly pleaded an action for breach of fiduciary duty, because its allegations indicated that the parties "created their own relationship of higher trust beyond that which arises from the underwriting agreement alone, which required Goldman Sachs to deal honestly with eToys and disclose its conflict of interest * * *."[16] Similarly, in this case, it is plausible to believe that the extensive reliance on DPM in the placement and monitoring of SPhinX's position with regard to the excess cash created a relationship of trust and confidence.
New York cases establish that a breach of fiduciary duty claim is usually a fact-specific inquiry. See, e.g., E.P. Lehmann Co. v. Polk's Modelcraft Hobbies, Inc., 770 F.Supp. 202, 205 (S.D.N.Y.1991) (denying motion to dismiss where the claim that defendant had a fiduciary duty was "not without some plausibility"). In AHA Sales, Inc. v. Creative Bath Products, Inc., 58 A.D.3d 6, 10-12, 21-22, 867 N.Y.S.2d 169 (2d Dept.2008), the court held that despite the appearance of a conventional business relationship, the plaintiff sales representative adequately pled a breach of fiduciary duty claim because the plaintiff alleged a long-established and dependent relationship with the defendant manufacturer. The court stated, "[w]hether plaintiff was obliged to accept the requirements allegedly imposed by defendants because of defendants' position of dominance or whether plaintiff assumed such obligations voluntarily are questions of fact not properly decided on a motion to dismiss." Id. at 22, 867 N.Y.S.2d 169 (internal quotation omitted). Similarly, in Manela v. Garantia Banking Ltd., 5 F.Supp.2d 165, 180 (S.D.N.Y.1998), the court held that the existence of a fiduciary relationship was a triable issue of fact where the plaintiff spoke to one of defendant's employees "on a near-daily basis and often acted in reliance on [employee's] advice, such as when he invested in the [debt fund managed by defendants]." Thus, the case law covering comparable situations establishes that the Plaintiffs have alleged sufficient facts to plausibly state that the relationship between DPM and SPhinX, arising out of the Service Agreement, was one of trust and confidence.[17]
*507 Finally, while the Plaintiffs have sufficiently alleged a relationship of trust and confidence based on the discussion above, it should be noted that the case for a fiduciary relationship is made even stronger by the fact that Aaron, the CEO and a director of DPM, was also a director of SPhinX. Under New York law, as discussed above, Aaron's actions are attributable to DPM. Therefore any breach of fiduciary duty by Aaron is attributable to DPM. The question of Aaron's fiduciary duty is discussed later in this section.

Paragraph 7 of the Service Agreement
The DPM Defendants also rely on paragraph 7 of the Service Agreement, which states that "[n]othing contained herein, expressed or implied, is intended or shall be construed to confer upon DPM any duty to ensure that the Companies [the SPhinX Funds] or any related entities are acting in compliance with any applicable domestic or international laws or regulations." But the problem with this argument is that paragraph 12(d) of the Service Agreement requires that DPM will not itself be in violation of law. Under 7 U.S.C. § 6d(a)(2); 7 U.S.C. § 6d(b) ("It shall be unlawful for any person ... that has received any money ... for deposit in a separate account ... to hold, dispose of, or use any such money ... as belonging to... any person other than the customers of such futures commission merchant."). See also 17 C.F.R. § 1.20 ("All customer funds shall be separately accounted for and segregated as belonging to commodity or option customers. Such customer funds when deposited with any bank, trust company, clearing organization or another futures commission merchant shall be deposited under an account name which clearly identifies them as such and shows that they are segregated as required by the Act and this part."). The gravamen of the breach of fiduciary duty claim is not that DPM failed to ride herd on PlusFunds, but rather that DPM violated its own obligations to assure that millions of dollars of excess cash would not be transferred to commingled accounts at RCM. Accordingly, paragraph 7 does not justify dismissal of the breach of fiduciary claimor any other claim in this action.

Fiduciary Relationship with PlusFunds?
The Defendants argue that the Service Agreement between DPM and SPhinX did not create a contractual relationship between DPM and PlusFunds, as PlusFunds was neither a party to, nor third-party beneficiary of, the contract. Aaron Brief in Support of Motion to Dismiss at 29. But the relationship of trust and confidence that establishes a fiduciary relationship need not be grounded in a contract. As the Court stated in EBC I, supra, a fiduciary relationship of trust and confidence can be found where the parties created their own relationship of higher trust beyond that which inheres in any contract. See also Sergeants Benev. Ass'n Annuity Fund v. Renck, 19 A.D.3d 107, 111, 796 N.Y.S.2d 77, 80 (1st Dept.2005) ("liability for breach of a fiduciary duty is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation. It is not mandatory that a fiduciary relationship be formalized in writing.... Thus, the ongoing conduct between parties may give rise to a fiduciary *508 relationship that will be recognized by the courts.") (internal quotations omitted).
Given the close relationship between SPhinX and PlusFunds, there is at least a jury question on whether the trust and confidence that developed from DPM's obligations and performance under the Service Agreement extended to the relationship between PlusFunds and DPM. To elaborate, the Service Agreement explicitly recognizes that PlusFunds is the investment manager for SPhinX. The Agreement further provides, among other things that (1) DPM was responsible for generating and distributing daily activity reports by computing, adjusting, verifying, updating and reconciling data obtained from PlusFunds (Service Agreement § 2A); (2) DPM was required to report to the Plus Funds Pricing Committee under certain situations (Service Agreement § 2(A.1)e, 2(B.1)c-d); and (3) every month "DPM will provide PlusFunds with a report detailing the causes of change in month-end indicative NAVs and finalized NAVs on those funds showing a greater change than 50 bps." (Service Agreement § 2(B.1)f). And DPM, simply by performing its contractual obligations, was aware that PlusFunds and SPhinX had entered into the IMA; that PlusFunds engaged DPM to serve as SPhinX Funds' administrator (FAC ¶ 103); that DPM "was obligated to perform financial and accounting services on behalf of SPhinX and PlusFunds." (FAC ¶¶ 103, 105); that PlusFunds' management and S & P convened a risk committee to analyze SPhinX's risk exposure with Refco, and PlusFunds relied on the weekly risk reports prepared by DPM (FAC ¶¶ 145, 148). All this is more than sufficient to create a jury question on whether the relationship between PlusFunds and DPM was one of trust and confidence.[18]

PlusFunds' Role in Investment Decisions
In another counter-argument, the Defendants argue that it was PlusFunds that ran the show and therefore no breach of fiduciary duty claim can lie against DPM. They note that the terms of the IMA gave PlusFunds authority to choose brokers and make investment decisions, and that PlusFunds' counsel admitted in the Proof of Claim proceedings before Judge Drain that PlusFunds, not DPM, arranged for the opening of the RCM account and the authority of RAL not DPM, to manage the cash in question.[19] The Defendants cite Glonti v. Stevenson, 2009 *509 WL 311293, at *6-7, 2009 U.S. Dist. LEXIS 13857, 13857, at *17-18 (S.D.N.Y.), which holds that when documents contain certain statements that contradict allegations in a complaint, the documents control and the court need not accept the allegations in the complaint as true. Moreover, the Defendants claim that Articles 3 and 5 of the Service Agreement confirm that DPM acted on the instruction of PlusFunds and that DPM had no role in the custody of funds or the selection of brokers or depositories.
The Plaintiffs of course do not deny that PlusFunds had broad duties and responsibilities, including the duty to maintain segregation of client funds. But this does not preclude the possibility that the functions delegated to DPM and DPM's performance of its significant responsibilities established a relationship of trust and confidence. Notably, under Article 2(H) of the Service Agreement DPM had the duty, without restriction, of "investment of excess cash in the Companies and each of the Portfolio Funds' cash accounts." And in response to the Defendants' assertion that Articles 3 & 5 confirm that DPM acted only on the instruction of PlusFunds as to the transfer of funds, the Plaintiffs disagree and allege that PlusFunds in fact delegated to DPM virtually all of its cash management functions. FAC ¶¶ 264-69, 336.
Again, the dispute between the parties raises questions of fact not appropriate for disposition on a motion to dismiss. The Plaintiffs' account of DPM's authority over cash distributions is plausible at the very least. As indicated above, the Service Agreement gives DPM the authority to invest excess cash. Given that provision, it would be odd to require that PlusFunds initiate every transfer of excess cash in writing; PlusFunds would gain nothing from such an arrangement as it could issue the written instruction itself directly to the custodian. It makes more sense that the requirement for written authorization of wire transfers would apply to funds over which the Service Agreement did not allow DPM to exercise discretionthat is, funds other than excess cash. And the Plaintiffs allege that DPM in fact transferred excess cash without written approval. See Supplemental Brief at 7-8 (citing FAC ¶¶ 6, 23, 25, 137, 154, 156, 331, 399, 407-408, 410). At a minimum, the terms of the Service Agreement and the IMA are ambiguous, and ambiguity in relevant contract provisions raises questions of fact. See Topps Co., Inc. v. Cadbury Stani S.A.I.C., 526 F.3d 63 (2d Cir.2008) (summary judgment inappropriate where contract terms are ambiguous and extrinsic evidence inconclusive).
Finally, even if the Defendants' interpretations of the IMA and the Service Agreement had merit (and the Service Agreement did not entrust DPM with a fiduciary duty) a fiduciary duty can be formed from the ongoing conduct between parties. And the Plaintiffs, as discussed above, have alleged DPM's conduct with respect to the transfers and management of excess cash. See, e.g., Hecht v. Andover Associates Management Corp., 27 Misc.3d 1202(A), 2010 WL 1254546, at *12 (Sup.Ct. N.Y.Cty.) (plaintiff's claim for breach of contract arises from the administrative services agreement, but claim for breach of fiduciary duty is based upon an independent duty arising from the defendant's role as the investment consultant). Accordingly, nothing in the IMA or the Service Agreement regarding PlusFunds' management authority justifies a motion to dismiss the claim against DPM for breach of fiduciary duty.

Offering Memoranda and Financial Statements
The Defendants argue that there can be no breach of fiduciary dutyor for *510 that matter, any other tortbecause the pertinent documents on which the Plaintiffs rely address the risk of RCM's insolvency. For example, Aaron states:
The Offering Memoranda identify two circumstances where certain assets held at prime brokers such as RCM could be at risk in the event of the insolvency of the prime broker. Additionally, the financial statements, which were certified by PlusFunds and audited by Pricewaterhouse Coopers, refer to the fact that funds held at broker-dealers such as RCM were exposed to the risk of loss in the event of the insolvency of the broker-dealer.
Aaron Brief in Support of Motion to Dismiss at 2.
But again, these arguments at best raise questions of fact that cannot be entertained on a motion to dismiss. First, the Plaintiffs plausibly dispute the contention that the Offering Memoranda and financial statements inform of the risk of insolvency of RCM. The Offering Memoranda refer to the "prime broker," and given the fact that the assets were initially deposited at Refco LLC, the memoranda could be construed as referring to Refco LLC as the prime broker. And Refco LLC's insolvency would not create the same risk because the accounts were segregated. The dispute between the parties as to whether RCM was a "prime broker" is one that cannot be resolved on a motion to dismiss. The Plaintiffs also point out that the documents could be construed as not even referring to the risk of unsegregated accounts, but rather to the much more limited risk of insolvency of a prime broker during a time when transactions were uncompleteda risk referred to by the parties as an "open-jaw risk." See Transcript of Oral Argument at 96 ("when you execute a transaction it's not closed for a period of time, and while it's not closed, if there's insolvency you're exposed to that risk ... because it leaves the segregated account for the time that it takes to open until it takes to close."). This open-jaw risk is far less extensiveboth as to the amount of funds and the duration of riskthan the risk to which the SMFF funds were subject once they were transferred to commingled accounts at RCM.
Similarly, the Defendants allege that the financial statements relied upon by the Plaintiffs as being misrepresentative actually disclose the risk that the excess cash could be exposed to loss in the event of the prime broker's insolvency. But again this argument does no more than raise questions of fact as to the identity of the prime broker and the meaning of the risk described. Moreover, the disclosures in the financial statements should be read together with the weekly risk reports, which disclosed risk to the assets in the $10-$25 million range when in fact it was much greatermeaning that a party who read the financial statements in context would not have been fully informed of the actual risk to the excess cash. In sum, the Plaintiffs' claim should not be dismissed on the ground that the underlying documents accurately disclosed the risk that the excess cash was unsegregated.

4. Breach of Fiduciary Duty Allegations Against Aaron
The Plaintiffs allege that Aaron breached fiduciary duties for various reasons, including: (1) failing to ensure that SPhinX's assets were maintained in customer segregated accounts (FAC ¶ 337); (2) enabling the transfer of SPhinX cash from regulated accounts at Refco LLC to unregulated accounts at RCM (FAC ¶¶ 22, 130-40, 244-51, 337); (3) failing to inform SPhinX and PlusFunds that SMFF's excess cash at RCM did not generate interest for a full year (FAC ¶¶ 22, 158, 363); *511 (4) concealing the fact that SPhinX's customer assets were at risk (FAC ¶¶ 153, 337); and (5) withholding relevant information regarding SPhinX Funds' exposure to Refco in the weekly risk reports (FAC ¶¶ 146-49, 337).

Existence of Fiduciary Duty
Aaron does not contest in his brief that he had a fiduciary duty to SPhinX. He does, however, contest that he had any fiduciary duty to PlusFunds. The Plaintiffs do not respond to Aaron's argument regarding PlusFunds and therefore have conceded the point. Leka v. United States, 2008 WL 686797, at *1 (N.D.N.Y.). So the claim against Aaron for breach of fiduciary duty to PlusFunds should be dismissed with prejudice. The remainder of the discussion in this section as to Aaron will focus on his arguments that he did not breach the fiduciary duty he had to SPhinX.

SPhinX Articles of Association
Aaron contends that the SPhinX Articles of Association absolve him of wrong absent wilful misconduct, and that the Plaintiffs have not pled such misconduct with sufficient particularity. The Plaintiffs do not disagree with the effect of the Articles of Association, but do claim that they have indeed alleged intentional wrongdoing with sufficient particularity. As discussed above, the Plaintiffs have clearly stated a litany of intentional actions by Aaron, including concealing the fact that customer assets were at risk and misstating information in the weekly risk reports. Therefore, the protection afforded by the Articles of Association does not support a motion to dismiss the claim for breach of fiduciary duty.[20] Accordingly, the Plaintiffs have sufficiently pled that Aaron owed fiduciary duties to SPhinX.

5. Breach of Fiduciary Duty Allegations Against Castranova
Castranova was president, Chief Operating Officer and member of the board of directors of DPM. The Plaintiffs allege that he personally owed fiduciary duties, based on a relationship of trust and confidence, because he was an authorized signatory on SPhinX's bank and broker accounts; he authorized wire transfers to and from SPhinX bank accounts; he directly oversaw many of the services provided by DPM to SPhinX; and he understood the SPhinX business model, including customer segregation requirements. (FAC ¶ 256).
*512 The Plaintiffs rely on Key Bank v. Grossi, 227 A.D.2d 841, 843, 642 N.Y.S.2d 403, 404 (3d Dept.1996), in which the court declared that "[p]ersonal liability will be imposed * * * upon corporate officers who commit or participate in the commission of a tort, even if the commission or participation is for the corporation's benefit." That case involved a claim for conversion. The Plaintiffs' claim for breach of fiduciary duty against Castranova is different, however, because the tort is grounded in a relationship of trust and confidence. It does not follow that just because (as determined above) DPM had a relationship of trust and confidence with SPhinX, that Castranova did as well.[21] Moreover, Castranova's situation is distinguishable from that of Aaron, who was a director of SPhinX and so clearly had fiduciary duties. And while Aaron's actions are strewn through the complaint, Castranova appears essentially as a bit player in terms of specific activity alleged. There is no indication, for example, that anything in the terms of the Service Agreement, or in Castranova's described activity, would lead SPhinX (much less PlusFunds) to have a relationship of trust and confidence with Castranova specifically.
If a fiduciary relationship has been sufficiently pled against Castranova, then it essentially means that any high-ranking corporate official is subject to personal liability for breach of fiduciary duty whenever the corporation breached a fiduciary duty. Yet this is not the law. Like the fiduciary duty claims brought against the officers in American Fin. Intern. Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, at *5 (S.D.N.Y.), the allegations of fiduciary duty owed by Castranova personally are "beyond bare."[22]See also A.I.A. Holdings, S.A. v. Lehman Bros., Inc., 1999 WL 47223, at *6 (S.D.N.Y.) (status as an officer or director does not establish a personal fiduciary duty with a customer of the corporation; no fiduciary duty found in this case where "Defendants have merely stated in conclusory and general terms that because Nassereddine solicited investors to the SIGMA fund and communicated with them, a fiduciary duty was established."). Accordingly, the claims against Castranova for breach of fiduciary duty should be dismissed with prejudice.

6. Breach of Fiduciary Duty Allegations Against Mellon
The Plaintiffs allege that Mellon also owed fiduciary duties to SPhinX and PlusFunds. They state that from the date of its acquisition, Mellon controlled DPM-Mellon, appointing the majority of the DPM-Mellon board, and that DPM-Mellon succeeded to all interests and obligations of DPM under the Service Agreement. (FAC ¶ 35, 104). Mellon allegedly met with PlusFunds' management and promised to focus its resources to remedy the problems in DPM's performance under the Service Agreement. (FAC ¶ 293). The Plaintiffs claim that Mellon assumed fiduciary duties by representing that SPhinX and PlusFunds could rely on Mellon's resources, support, and participation in bringing DPM's performance "up to Mellon standards." (FAC ¶ 335).
The Plaintiffs' arguments should be rejected. As already discussed, Mellon's relationship with the DPM entities is plainly insufficient to impose liability on Mellon *513 for the conduct of those entities.[23] And the promise to remedy DPM's performance and bring it up to Mellon's standards is insufficient to establish a relationship of trust and confidence that would bear upon any unauthorized transfer of excess cash to RCM. The Amended Complaint itself indicates that the "problems" referred to by Mellon related solely to calculation of NAVs. Clearly Mellon couldn't have been talking about improving DPM's performance in a way that would prevent or uncover transfer of excess cash to RCM. The last thing that the corrupt insiders at PlusFunds would have wanted was Mellon stepping in to prevent those transfers. And the innocent insidersas so often emphasized in the Amended Complainthad no idea that the cash was in a commingled account and so obviously could not have been complaining about DPM's performance regarding the transfers to RCM. Accordingly, the promise to bring performance up to Mellon standards cannot plausibly be interpreted to create a relationship of trust and confidence with regard to anything pertinent to the Plaintiffs' claims regarding transfer of excess cash.[24]
Moreover, at the time of the alleged promise, Mellon had no business relationship with SPhinX or PlusFunds, and no corporate relationship to DPM. No case law cited by the Plaintiffs provides authority for finding a fiduciary relationship under such attenuated circumstances. Indeed the cases are to the contrary. See, e.g., Breindel & Ferstendig v. Willis Faber & Dumas Ltd., 1996 WL 413727, at *7 (S.D.N.Y.) (relationship between law firm and an agent of a client was indirect: "the Court has uncovered no case where such an attenuated and indirect relationship was found to constitute a fiduciary relation. To the contrary, the cases uniformly stand for the proposition that even where a direct business relationship exists between two parties, that alone is insufficient to render the relationship a fiduciary one."). Accordingly, Count V should be dismissed as to Mellon with prejudice.

7. Proximate Cause
To summarize, the Plaintiffs have sufficiently pled 1) that DPM had a fiduciary relationship with SPhinX and PlusFunds; and 2) that Aaron had a fiduciary relationship with SPhinX. But the Plaintiffs have not sufficiently pled 1) that Aaron had a fiduciary relationship with PlusFunds; 2) that Castranova had a fiduciary relationship with either SPhinX or PlusFunds; or 3) that Mellon had a fiduciary relationship with either SPhinX or PlusFunds.
*514 As to the fiduciary claims that still remain, then, DPM and Aaron argue that the Plaintiffs have not made sufficient allegations that any breach of fiduciary duty proximately caused the damages to SMFF and (in DPM's case) PlusFunds. Where "damages are sought for breach of fiduciary duty under New York law, the plaintiff must demonstrate that defendant's conduct proximately caused injury in order to establish liability." LNC Inves. v. First Bank, N.A., 173 F.3d 454, 465 (2d Cir. 1999). See also Montreal Pension Plan, supra, 568 F.3d at 381 ("To plead proximate cause, the complaint must allege that Plaintiffs' injury was a direct or reasonably foreseeable result of [the defendant's] conduct.").
The Defendants argue that the claim damages were proximately caused by the combination of wrongdoing of Refco insiders that left RCM insolvent, and the actions of PlusFunds in selecting RCM, causing the account to be opened, and delegating authority to RAI to transfer the funds from Refco LLC to unprotected accounts at RCM. But the Defendants' argument of alternative cause is not persuasive. The Plaintiffs specifically allege that DPM's and Aaron's failure to maintain the excess cash in segregated accounts bore directly on the loss of excess case because if it had remained in segregated accounts, Refco's insolvency would have had little effect. Similarly, the Plaintiffs specifically allege that DPM's and Aaron's failure to provide accurate risk reports was causative because if innocents at PlusFunds had known the risk, they would have got the money out of RCM. See FAC ¶¶ 253-254, 280. These are statements attributing direct causation to DPM and Aaron.
The Defendants' proximate cause argument is essentially that because there were other wrongdoers involved, DPM and Aaron cannot be found to have proximately caused the losses to SMFF and PlusFunds. But it cannot be the case that when multiple wrongdoers act separately, a plaintiff cannot plead proximate cause as to any particular one. The question is whether the injuries were the "natural and probable consequence" of the actions or inactions of a particular defendant Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir.1985). And despite all the actions of others, the Plaintiffs plausibly and with sufficient particularity assert that if DPM and Aaron had acted to prevent the transfers, or to disclose the fact that they were made, the probable result would have been that the transfers would not have been effectuated or would have been discovered and undone.
Courts have found proximate cause in factual scenarios similar to the instant case. Thus, in In re Allou Distributors, Inc., 395 B.R. 246 (Bkrtcy.E.D.N.Y.2008), the court found that KPMG, a company's independent auditor, proximately caused the losses to the company. A third-party manipulated the company's reported accounts receivable and inventory and looted the company's assets. The Plaintiffs alleged that KPMG's representations in their audit opinions of the company's financial statements were materially false and misleading. The court found that "[a]s a direct and proximate result" these misstatements, the company's officers, directors, shareholders, and attorneys were not advised of the third-party's improper conductand if they had been so informed, it was probable that they would have acted to remedy it. The fact that the third-party was essentially the prime-mover in the scheme did not get the auditor off the hook, because the concept of proximate cause is broad enough to cover all those whose misconduct creates a "natural and probable consequence" of damage to the plaintiff. New York law provides that *515 proximate causation is present where it was "reasonably foreseeable" that the damage incurred would follow from the wrongful act. Id. See also In re Parmalat Sec. Litig., 501 F.Supp.2d 560, 580 (S.D.N.Y.2007) ("It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the company harm.").
Questions of proximate cause are generally left to the jury. See, e.g., In re Sept. 11 Prop. Damage & Bus. Loss Litig., 468 F.Supp.2d 508, 531 (S.D.N.Y.2006) ("the issue of proximate cause is fact-laden and inappropriate for a motion to dismiss"); Am. Tissue v. Donaldson, Lufkin & Jenrette Secs. Corp., 351 F.Supp.2d 79, 91 (S.D.N.Y.2004) ("proximate causation generally remains an issue of fact for the jury"). In this case the Plaintiffs specifically allege that DPM and Aaron had fiduciary duties 1) to assure that SMFF's excess cash not be swept into unsegregated accounts; and 2) to accurately disclose the risk in SMFF's position. Certainly for purposes of a motion to dismiss, it is plausible to believe that when DPM and Aaron breached those fiduciary duties, it was reasonably foreseeable that other wrongdoers would continue to place the assets in unprotected accounts at RCMwithout the knowledge of, and therefore without the possibility of remediation by, the innocent insiders. And it should be for the jury to determine whether the innocents would have been able to act in such a way as to prevent or abrogate the transfers.

Recommendations:
1. The DPM entities' motion to dismiss Count V should be denied.
2. PlusFunds' claim against Aaron for breach of fiduciary duty should be dismissed with prejudice.
3. Aaron's motion to dismiss SMFF's claim for breach of fiduciary duty should be denied.
4. Count V should be dismissed as to Castranova, with prejudice.
5. Count V should be dismissed as to Mellon, with prejudice.

F. Count VIAiding and Abetting Breach of Fiduciary Duty (against all Defendants)
Count VI alleges that each of the Defendants aided and abetted two sets of wrongdoers: 1) Refco LLC and RCM in the scheme to transfer SMFF excess cash to unprotected accounts; and 2) Sugrue, Owens, Kavanagh and Aaron, who allegedly owed fiduciary duties based on their relationships with either SPhinX or PlusFunds or both.[25]
In order to state a cause of action for aiding and abetting a breach of fiduciary duty under New York law, a plaintiff must adequately plead "(1) the existence of a violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer." Chemtex, LLC v. St. Anthony Enterprises, Inc., 490 F.Supp.2d 536, 546 (S.D.N.Y.2007). This section will parse out these three requirements as they relate to the specific actors alleged to have breached fiduciary duties, and as to the *516 specific defendants alleged to have aided and abetted them.

1. Allegations of Underlying Breach of Fiduciary Duty
The Defendants do not contest the Plaintiffs' assertion that Sugrue, Owens, Kavanagh and Aaron committed underlying breaches of fiduciary duties. But the Defendants do contest the underlying breaches with respect to RCM and Refco LLC. They contend that Refco LLC and RCM owed no fiduciary duties to either SPhinX or PlusFunds.
In a Report and Recommendation entered in Krys v. Sugrue, dated March 1, 2010, the Special Master considered whether Refco had committed a breach of fiduciary duty against SPhinX and PlusFunds. The Special Master determined that the Plaintiffs "have sufficiently alleged that Refco breached a fiduciary duty owed to SPhinX and PlusFunds through its actions related to the transfer of SMFF excess cash from Refco LLC to RCM. The fiduciary duty is established by the right to segregation and by a relationship of trust and confidence."
The legal analysis on the question of primary wrongdoing by Refco is exactly the same in this case. Therefore, that analysis is incorporated herein and the Special Master recommends that the motion to dismiss Count VI be denied insofar as it is based on the lack of primary wrongdoing by Refco LLC and RCM.[26]

2. Knowledge
An aiding and abetting claim requires that the defendant had knowledge of the underlying conduct, a standard that is not satisfied by a mere allegation of constructive knowledge. See Kolbeck v. LIT Am., Inc., 939 F.Supp. 240, 246 (S.D.N.Y.1996) ("New York common law... has not adopted a constructive knowledge standard for imposing aiding and abetting liability"). Rather, New York law requires that a plaintiff must alleged facts that give rise to a "`strong inference'" of knowledge. Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC, 479 F.Supp.2d 349, 367 (S.D.N.Y.2007) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 293 (2d Cir.2006)).[27]
There is dispute in the case law on whether "conscious avoidance" is sufficient for an aiding and abetting claim. In Fraternity Fund, supra, Judge Kaplan opted for a standard of conscious avoidance for aiding and abetting claims, and distinguished that standard from constructive knowledge:

*517 Constructive knowledge is "[knowledge that one using reasonable care or diligence should have, and therefore that is attributed by law to a given person." Conscious avoidance, on the other hand, occurs when "it can almost be said that the defendant actually knew" because he or she suspected a fact and realized its probability, but refrained from confirming it in order later to be able to deny knowledge. Conscious avoidance therefore involves a culpable state of mind whereas constructive knowledge imputes a state of mind on a theory of negligence. Reflecting this analysis, the Second Circuit has held in the criminal context that conscious avoidance may satisfy the knowledge prong of an aiding and abetting charge. Accordingly, the Court sees no reason to spare a putative aider and abettor who consciously avoids confirming facts that, if known, would demonstrate the fraudulent nature of the endeavor he or she substantially furthers.
Fraternity Fund Ltd., 479 F.Supp.2d at 368 (citations omitted).
Other courts in the Southern District have held that even conscious avoidance is not enough  the plaintiff must allege that the alleged aider and abettor knew about the primary wrong. See, e.g., Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC, 446 F.Supp.2d 163, 202, n. 273 (S.D.N.Y.2006) (noting that the weight of authority under New York law requires actual knowledge, as distinct from "willful blindness"). The difference, however, between actual knowledge and "it can almost be said that the defendant actually knew" based on underlying knowledge of facts and circumstances is, to say the least, a narrow one. And any difference is not material in this case.
Most of the Defendants do not specifically argue that the Plaintiffs have failed to plead actual knowledge of the underlying breaches of fiduciary duty.[28] The exceptions are Aaron and Mellon. Aaron argues that the allegations of knowledge as to him are conclusory. But in fact the Amended Complaint alleges with some specificity how Aaron could have and did become aware of the underlying breaches of fiduciary dutyspecifically the improper transfers of excess cash to RCM. The Amended Complaint alleges that Aaron knew of the customer segregation requirements; that he admitted knowledge that transfers to RCM could render the excess cash unprotected; that he prepared false risk reports that hid the wrongdoing; and that he performed acts under the Service Agreement that would plausibly have led to his knowledge both that the excess cash was transferred to RCM and that the cash was unsegregated there. See, e.g., FAC ¶¶ 38, 136, 147, 350, 352.
Moreover, "[a]ctual knowledge may also be implied from a strong inference of fraudulent intent." Rosner v. Bank of China, 528 F.Supp.2d 419, 426 (S.D.N.Y. 2007), and a motive is probative of that inference. The Plaintiffs allege that Aaron had the motive to further the scheme because he wanted to sell DPMthe SPhinX account was critical to the value of DPM, and pleasing Refco was critical to keeping the SPhinX account. FAC ¶ 134. Another indication of Aaron's knowledge is the *518 alleged attempt to alter the Service Agreement to remove the provisions that most directly pertained to the obligations to keeping the cash in segregated accounts. FAC ¶¶ 121-22. That alleged attempt raises a plausible inference that Aaron and DPM knew about the underlying wrongdoing. All of these allegations together are sufficiently particularized and plausible to withstand a motion to dismiss that is grounded on lack of knowledge of the underlying breaches of fiduciary duty.[29]
Mellon is a different matter. The Plaintiffs do not allege that Mellon knew about the underlying breaches of fiduciary duty. Rather, the allegation is that Mellon "fully understood the problems with DPM's performance on the SPhinX account." FAC ¶ 293. That cannot be the same as knowing that funds were being transferred improperly into unprotected accounts at RCM. Indeed, if Mellon did know about the improper transfers, it is implausible to believe that Mellon would have taken on DPM's obligations, as the Plaintiffs allege-that would have been a bad business decision indeed. And as discussed above, the Plaintiffs have not sufficiently pled that Mellon succeeded to the Service Agreement or that Mellon is liable for DPM's actions on grounds of piercing the corporate veil. Accordingly, Count VI should be dismissed as to Mellon.

3. Substantial Assistance
"In the aiding and abetting context, a plaintiff must allege that the defendant's substantial assistance in the primary violation proximately caused the harm on which the primary liability is predicated. Plaintiffs must allege more than but-for causation. They must allege also that their injury was a direct or reasonably foreseeable result of the conduct." Fraternity Fund Ltd. v. Beacon Hill Asset Management, LLC, 479 F.Supp.2d 349, 370-71 (S.D.N.Y.2007).[30]
The Defendants argue that there is no causal connection between the Defendants' activity and the breaches of fiduciary duty by Refco and the corrupt insiders at PlusFunds. But for the reasons set forth in the discussion of proximate cause in the section on breach of fiduciary duty, these arguments must failwith respect to all Defendants other than Mellon. Each of the Defendants other than Mellon is alleged to have assisted and engineered the transfer of cash into unprotected accounts; and each of the Defendants other than Mellon is alleged to have hidden and misrepresented the risk to the SMFF excess cash when it was placed at RCM. The Plaintiffs adequately allege that if the Defendants had not acted as they did, the assets would never have been transferred to unprotected accounts or, if they had been, the innocent insiders would have discovered the risk and acted to get the money back. Those allegations are sufficient to withstand a motion to dismiss.[31]
For the reasons just expressed, the allegations against Castranova are sufficient *519 to withstand a motion to dismiss for aiding and abetting, even though the Plaintiffs have not sufficiently pled a breach of fiduciary duty as to him. The Plaintiffs do not have to establish a relationship of trust and confidence with Castranova in order to hold him liable as an aider and abettor. Put another way, a party need not have a fiduciary duty in order to be liable for the aiding and abetting the breach of fiduciary duty of another. The Plaintiffs allege that Castranova was personally involved in the transfers, in the misrepresentations, and in the hiding of information as to risk, and these allegations are sufficient to establish proximate cause for the aiding and abetting count.
But, as before and throughout, the allegations as to Mellon are way too thin to establish that any of Mellon's conduct proximately caused the damages to SMFF and PlusFunds. There is no allegation that Mellon was directly involved in the transfers, in the preparation of risk reports, or in the hiding of any information. And as before and throughout, the Plaintiffs' efforts to place Mellon on the hook through its promise to fix some problems at DPM, or through its corporate relationship with the DPM entities, are wanting.

Recommendations:
1. The motions to dismiss Count VI should be denied with respect to all Defendants except Mellon.
2. Count VI should be dismissed as to Mellon, with prejudice.

G. Count VIIInterference with Contract/Prospective Contract (Against AH Defendants).
The Plaintiffs allege that each of the defendants tortiously interfered with (1) the IMA between PlusFunds and SPhinX; and (2) a prospective contract between PlusFunds and SPhinX and Lehman Brothers that would have resulted in an additional $500 million in assets under management.[32]

1. Choice of Law
Aaron argues that New York law applies to the claims for tortious interference; the rest of the parties opt for New Jersey law. New Jersey choice of law rules apply as this case originated there. Some cases hold that there is no conflict between New Jersey and New York law. See, e.g., Hahn v. OnBoard LLC, 2009 WL 4508580, at *7 (D.N.J.) ("The legal elements for tortious interference with a contract and tortious interference with prospective economic advantage are the same in both New York and New Jersey."); Zhang v. Wang, 2006 WL 2927173, at *2 n. 1 (E.D.N.Y.) ("As the parties have not identified any substantive difference between New York and New Jersey law regarding tortious interference, the Court applies New York law.").
The Second Circuit has found a slight difference in the standards for tortious interference with contract under New Jersey and New York law. That court has stated that "New Jersey ... require[s] proof that the defendant acted maliciously, while New York only requires proof of malice if the economic interest defense has been triggered." White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 284 (2d Cir.2006). In this case, the defendants make no defense of economic necessity, and therefore New York law could be read as not requiring a showing of malice for the tortious interference with contract *520 claim. That difference is slight indeed, however, because New York requires a plaintiff in every case to show "the defendant's intentional procurement of the third-party's breach of the contract without justification." Medtech Products Inc. v. Ranir, LLC, 596 F.Supp.2d 778, 796 (S.D.N.Y.2008), and New Jersey's requirement of a showing of "malice" is almost identical to New York's requirement of "intent." See DiMaria Const., Inc. v. Interarch, 351 N.J.Super. 558, 560, 799 A.2d 555, 557 (N.J.Super.A.D.2001) (malice is defined to mean that the interference was inflicted intentionally and without justification or excuse);
It should also be noted that New York cases do require a showing of malice in the first instance for claims of tortious interference with a prospective contract. Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir.2003). So the only possible difference in the malice standard in this case would relate to tortious interference with the IMA.
To the extent there is any difference at all between the substantive standards, a good case could be made for New York law, because that is where PlusFunds was located and that is where the SPhinX board met. But as will be seen in the discussion of the tortious interference count, any arguable difference between the two states' laws will not make a difference in this case.

2. Tortious Interference Standards
"The tort of inducement of breach of contract, now more broadly known as interference with contractual relations, consists of four elements: (1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993) (emphasis added). See also White Plains Coat & Apron Co. v. Cintas Corp., 460 F.3d 281, 285 (2d Cir.2006) ("when there is knowledge of a contract, and a competitor takes an active part in persuading a party to the contract to breach it by offering better terms or other incentives, there is an unjustifiable interference with the contract.") (emphasis added). In addition, the Plaintiffs must allege each of these elements in a non-conclusory fashion. World Wide Communications, Inc. v. Rozar, 1997 WL 795750, at *6 (S.D.N.Y.).
The New York Court of Appeals has explained that because "[g]reater protection is accorded an interest in an existing contract ... than to the less substantive, more speculative interest in a prospective relationship" the defendant's conduct must be more culpable for a claim of tortious interference with a prospective contract. Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628, 406 N.E.2d 445 (1980). A properly pled claim for tortious interference with a prospective contract requires a showing that: "(1) [plaintiff] had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media Corp., 449 F.3d 388, 400-02 (2d Cir.2006). In addition, the defendant's interference must be direct. The defendant must target some activities toward the third party and convince the third party not to enter into a business relationship with the plaintiff. Fonar Corp. *521 v. Magnetic Resonance Plus, Inc., 957 F.Supp. 477, 482 (S.D.N.Y.1997).

3. Application to Plaintiffs' Claims

a. To the IMA
The Plaintiffs' allegations lack any plausible assertion that the Defendants, by their actions relating to the transfer of excess cash into unprotected accounts, intentionally induced PlusFunds to breach the IMA. The absence of allegations of intent to interfere with the contract is fatal to the claim for tortious interference. Whatever the Defendants might have intended by their alleged wrongs, their goal was not to cause a breach of contractual relations between SPhinX and PlusFunds. At best any breach of the terms of the IMA was a collateral effect of the Defendants' alleged plan to maintain good relations with Refco by taking part in the scheme to transfer SMFF's excess cash into unprotected accounts at RCM. That is insufficient to show intentional inducement of the breach of contract. See, e.g., Wolff v. Rare Medium, Inc., 171 F.Supp.2d 354, 359 (S.D.N.Y.2001) (to be liable for tortious interference, the defendant must have used wrongful means "to induce" a contracting party to breach a contract with the plaintiff). PlusFunds might have had assistance from the defendants, but PlusFunds did not need and did not receive an inducement to breach the IMA.
This is not a case, for example, in which a defendant improperly targeted a person who was contracted to another and got that person to break a contract, or one in which a defendant took a bargain that was contracted to another. See, e.g., Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., supra (claim for entering into a contract that deprived the plaintiff of exclusive distributorship rights). Nor is it a case in which the very reason for the misconduct is to impair a plaintiffs contractual interestssuch as where a business seeks to undermine the economic position of a competitor. See generally Kirch v. Liberty Media Corp., 449 F.3d 388 (2d Cir.2006) (evaluating plaintiffs claims that defendants, by making defamatory statements, would obtain an economic advantage in the market by destroying the plaintiffs contractual relationships); White Plains Coat & Apron Co., Inc. v. Cintas Corp., 460 F.3d 281 (2d Cir.2006) (luring customers from a competitor). Essentially the Plaintiffs are trying to shoehorn a fraud-based harm into a tortious interference claim, simply because a contract is somehow involved.
The Plaintiffs have not cited any case in which a tortious interference claim was recognized simply because a defendant engaged in wrongful conduct that had the effect of impairing a plaintiff's contract.[33] Under the Plaintiffs theory, anyone who tortiously injures a person who, because of that injury, cannot perform any of its contracts, would be liable for tortious interference of all the contracts. That is not the law. See, e.g., Medtech Products Inc. v. Ranir, LLC, 596 F.Supp.2d at 815 (claim should be dismissed in the absence of a specific allegation that the defendant used *522 wrongful means with the intent "to procure" the breach of a contract between the plaintiff and another). Accordingly, the claim for tortious interference with the IMA should be dismissed with prejudice.[34]

b. To the Prospective Contract With Lehman Brothers
The claim for tortious interference with a prospective contract with Lehman Brothers suffers the same infirmity as the claim concerning the MA. The Plaintiffs do not, and could not possibly, argue that the alleged wrongful acts of the Defendants were directed toward inducing Lehman Brothers to refuse to do business with SPhinX and PlusFunds. Any lost economic advantage was only a collateral effect of 1) the transfer of cash to RCM; 2) the upstreaming of those assets; and 3) the bankruptcy of RCM.
The claim with respect to the Lehman Brothers lost opportunity is infirm for other reasons as well. First, the Plaintiffs have not adequately pled that that the Lehman Brothers contract would have been consummated. See, e.g., Jones v. City School Dist. of New Rochelle, 695 F.Supp.2d 136, 147-48 (S.D.N.Y.) (where plaintiff was not offered employment, he failed to plead tortious interference with prospective contract where he did not plead that he would have been hired if defendant had completed the evaluation and provided a reference). Second, as discussed above, both New York and New Jersey require a showing of malice when the claim is for tortious interference with a prospective contract. The Plaintiffs do not contend that they have sufficiently pled malice. They simply contend, incorrectly in this instance, that they don't need to do so.
For all these reasons, the Plaintiffs' claim for tortious interference with the prospective contract with Lehman Brothers should be dismissed with prejudice.[35]

Recommendation: Count VII should be dismissed in its entirety, with prejudice.

H. Count VIIIFraud/Misrepresentation (Against all Defendants).
To prove a fraudulent misrepresentation *523 under New York law,[36] a plaintiff must show that: (1) the defendant made a material false statement; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. Blank v. Baronowski, 959 F.Supp. 172, 177 (S.D.N.Y.1997). Where the fraud is based on alleged misrepresentations, the complaint must "specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.2001) (quotation omitted).
To satisfy Fed.R.Civ. P. 9(b), a plaintiff pleading fraud based on deceptive conduct "must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on [plaintiffs]." In re Parmalat Sec. Litig., 383 F.Supp.2d 616, 622 (S.D.N.Y. 2006).
An action for breach of contract may not be converted into one for fraud merely by alleging that the contracting party never intended to meet its contractual obligations. Hargrave v. Oki Nursery, Inc., 636 F.2d 897, 898-99 (2d Cir.1980) ("If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort."). To plead fraud for claims arising from contractual relations, a plaintiff must: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable damages. Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir.1996). See generally Papa's-June Music, Inc. v. McLean, 921 F.Supp. 1154, 1162 (S.D.N.Y.1996) (dismissing fraud claim where it was not "sufficiently distinct from the breach of contract claim"; noting that the complaint "merely append[ed] allegations about [defendant's] state of mind to the claim for breach of contract."). The misrepresentation of a present fact while performing a contract may be actionable as a fraud claim. MCI Worldcom Communications, Inc. v. North American Communications Control, Inc., 2003 WL 21279446, at *10 (S.D.N.Y.).
Count VIII alleges misrepresentations and deceptive acts arising from (1) the *524 offering memoranda and marketing materials prepared by DPM; (2) DPM's annual financial statements for SMFF; and (3) the weekly risk reports given by DPM to the PlusFunds' Risk Committee. The Complaint alleges at least the following fraudulent misrepresentations:
1. The offering memoranda and marketing materials of SPhinX Ltd., SPhinX Strategy Fund Ltd., SPhinX Plus Ltd., and PlusFunds Manager Access Fund SPC Ltd., which made the following representations: (a) representations that customer cash would be maintained in customer segregated accounts; (b) representations that customer assets would be ring-fenced, segregated, and non-commingled; (c) representations that customer assets within a segregated portfolio would be available only to satisfy liabilities to the creditors of the specific segregated portfolio; and (d) representations that assets would be invested in accordance with restrictions imposed by the Irish Stock Exchange, including the requirement that no more than 20% of the value of the gross assets of each portfolio would be exposed to the creditworthiness or solvency of any one counterparty and the requirement that SPhinX would observe the general principle of diversification of the risk. (FAC ¶ 379). The Plaintiffs claim that these documents failed to disclose that hundreds of millions of dollars of SMFF's cash was deposited and commingled in accounts at RCM.
2. The audited financial statements for SMFF for 2002, 2003, and 2004 and the unaudited quarterly financial statements for SMFF for those same years and the 2005 financial statements allegedly asserted that excess cash would be segregated to control market risk exposure. (FAC ¶ 380). Plaintiffs allege that each of these representations was false and misleading when made in light of the fact that SMFF's excess cash was routinely moved to unprotected accounts at RCM beginning in December 2002. (FAC ¶ 381).
3. The weekly risk management summaries given to PlusFunds' risk committee routinely reflected SPhinX's total exposure to Refco in the $15 to $25 million range at any given time, when in reality, SMFF had hundreds of millions of dollars at risk in unprotected RCM accounts. (FAC ¶ 393).
In their motions to dismiss, the Defendants assert that the Plaintiffs' fraud claim: 1) is duplicative of the breach of contract claim; 2) does not meet the particularity standards of Rule 9(b); and 3) does not properly plead proximate cause. In addition, Mellon argues, on what should now be familiar grounds, that neither its corporate relationship to the DPM entities nor its promise to bring DPM up to Mellon standards is sufficient to hold it liable. Each of these arguments is discussed in turn.

1. The Plaintiffs' Fraud Claim Does Not Duplicate Their Breach of Contract Claim
The Defendants assert that the only actions they undertook in relation to SPhinX were defined by and required under the Service Agreement, and therefore, the fraud claim duplicates the breach of contract claim. According to the Defendants it is not enough to allege that they broke a contractual promise to provide accurate information.
In Blank, 959 F.Supp. at 180, the court noted the distinction between fraudulent misrepresentations about the intent to perform a contactwhich are not independently actionableand fraudulent misrepresentations made about present facts during the performance of the contract, which are actionable:

*525 Plaintiff * * * does not only allege that [Defendant] made these false statements before the formation of the joint venture agreement in order to induce plaintiffs consent, but also that [Defendant] repeated them each time he asked to borrow money from plaintiff after the joint venture agreement was allegedly formed. * * * Although these false representations essentially repeated the terms of the joint venture agreement, they were "extraneous" to the contract in that they misrepresented a present fact (i.e., that defendant believed a joint venture agreement existed) rather than defendant's future intent to honor that contract.
See also First Bank of the Americas v. Motor Car Funding, Inc., 257 A.D.2d 287, 690 N.Y.S.2d 17, 21 (1st Dept.1999) ("Unlike a misrepresentation of future intent to perform, a misrepresentation of present facts is collateral to the contract * * * and therefore involves a separate breach of duty.").
As in Blank and First Bank, the alleged fraudulent statements in this case were "extraneous" to the contract in that they misrepresented a present fact (i.e., that the SMFF excess cash was protected in segregated accounts). These were not statements at the outset about the Defendants' future intent to honor a contract. Thus, the Defendants' motion to dismiss the fraud claim on the ground that it duplicates the contract claim should be rejected.

2. Rule 9(b) Particularity Requirements as Applied to the Claims Against the DPM entities and the Individual Defendants[37]
The Defendants argue that the fraud claims fail to meet the heightened pleading standards of Rule 9(b). Specifically, they argue that the Complaint: (1) fails to identify the alleged misrepresentations; (2) fails to identify the specific individuals to whom enumerated communications were allegedly made; and (3) fails to state the time and place of these alleged communications. The Defendants also claim that the Complaint does not specify which offering memoranda, marketing materials, and financial statements were relied on by any particular individual or when any such documents were reviewed.
"In order to comply with Rule 9(b), `the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" Apace Communications, Ltd. v. Burke, 522 F.Supp.2d 509, 515 (W.D.N.Y.2007) (quoting Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290 (2d Cir.2006)). In addition, Plaintiffs must plead fraudulent intent:
Although [m]alice, intent, knowledge and other condition of mind of a person may be averred generally, this leeway is not a license to base claims of fraud on speculation and conclusory allegations. [P]laintiffs must allege facts that give rise to a strong inference of fraudulent intent, which may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.
Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, *526 187 (2d Cir.2004) (internal citations omitted).[38]

a. Pleading who, what, where, when.
As the Plaintiffs note, a court must read the complaint as a whole and cannot cherry-pick broad and vague allegations where other parts of the complaint provide the necessary detail. In re Philip Servs. Corp. Sees. Litig., 383 F.Supp.2d 463, 475-76 (S.D.N.Y.2004). Reading the Amended Complaint as a whole, it is evident that the Plaintiffs have satisfied the Rule 9(b) particularity standards with respect to Aaron, Castranova, and the DPM entities.
First, with respect to the offering memoranda and marketing materials, the Plaintiffs sufficiently allege where and when the alleged misrepresentations were made. The Amended Complaint discusses in detail the SPhinX offering memoranda and marketing materials and alleges that they were prepared at least in part by DPM acting through Aaron and Castranova. FAC ¶¶ 3, 19, 22, 55, 58-59, 67, 73-74. The Amended Complaint does not specify the date of these materials, but under the circumstances it is sufficiently clear that they were prepared and distributed near the time the SPhinX funds were created. Certainly the defendants are aware of the existence and origination of these documents and cannot plausibly allege that they are left in the dark by the Amended Complaint as to these documents. Finally, in FAC 1384, the Plaintiffs allege that the offering memoranda and marketing materials were "received, reviewed, and * * * relied upon" by innocents at SPhinX and PlusFunds; and those individuals are identified elsewhere in the Amended Complaint. See, e.g., FAC ¶¶ 54, 205, 384. That specific allegation of review and reliance is usefully distinguished from the facts of American Financial Intern. Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, at *9 (S.D.N.Y.2007), where Judge Lynch held that an allegation that the plaintiffs "relied" on representations was insufficiently particular because the "complaint conspicuously fails to allege that plaintiffs read the allegedly misleading *527 registration statements, or even that they knew of their existence."
As to the financial statements, the Plaintiffs specifically state that they were false and why they were; the timing of those statements is apparent; and the Amended Complaint specifically alleges that the statements were reviewed and relied upon by identified innocent insiders at Plus-Funds. FAC ¶¶ 54, 205, 384.[39]
Next are the weekly risk reports, as to which the Plaintiffs specifically allege that they misrepresented the true risk to the SMFF excess cash, and that these specific misrepresentations of the amount of risk were reviewed and relied upon by the PlusFunds Risk Committeeindeed they were prepared for the very purpose that the Committee would review and rely upon the findings. FAC ¶¶ 145, 148, 392-394. The Amended Complaint does not specifically allege the date of each of these risk reports, but requiring such particularity would be silly. The Plaintiffs are claiming that each of the risk reports contained fraudulent misstatements, and that the Defendants prepared them every week for an extended period, described in the Amended Complaint as 2003 through most of 2005. DPM knows the details and the timing of the risk reports perfectly well, and Rule 9(b) does not mandate the hypertechnical and unnecessary exercise of providing specific dates of weekly risk reports prepared over a multi-year period. See Internet Law Library, Inc. v. Southridge Cap. Mgmt., LLC, 223 F.Supp.2d 474, 481-482 (S.D.N.Y.2002) (finding sufficient specificity in an allegation that frequent fraudulent conversations were conducted "all through March and April of 2000").
Accordingly, the Plaintiffs have sufficiently pled the "who, what, where, when" details required by Rule 9(b).[40]

b. Allegations of Fraudulent Intent
A plaintiff can satisfy the Rule 9(b) requirement of pleading fraudulent intent by "(1) alleging facts to show that defendants had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp., 84 F.3d 629, 634 (2d Cir.1996). If it is clear from the pleading that the statements of a particular defendant were known or must have been known to be false, this is enough to show fraudulent intent. American Financial Intern. Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, at *8 (plaintiffs sufficiently pleaded Bennett's fraudulent intent: "as the alleged mastermind of the underlying fraud, he must have known the statements were false").
None of the Defendants are alleged to be the masterminds of the fraud in this case. But the Plaintiffs do allege with particularity that both Aaron and Castranova had a plausible economic motive to commit the alleged fraud. The Plaintiffs claim that Aaron and Castranova each had a desire to cash out their interest *528 in DPM, and that the value of DPM as an enterprise depended centrally on its business with PlusFunds and SPhinX. FAC ¶¶ 250, 259. Because of the personal relationship between Sugrue and Refco, the Plaintiffs allegeand it is at least plausible to believethat Aaron and Castranova found it important to please Sugrue and Refco by allowing the SMFF excess cash to be swept into RCM, where it would then be upstreamed to fund the Refco fraud. A fair inference can be drawn that without that cooperation, DPM could have been terminated and the value of DPM on the market would have decreasedthus giving Aaron and Castranova a motive to cooperate.
Aaron argues that the allegation of motive does not make sense because if the Individual Defendants wanted to maintain the relationship with SPhinX and PlusFunds, they would not allow transfers of cash that would ultimately harm the interests of SPhinX and PlusFunds. But there are two problems with Aaron's argument. First, this converse analysis of motivation at best creates a question of factthe fact that there might be another plausible explanation of the stated facts does not mean the Plaintiffs' analysis is implausible. Second and more important, the Plaintiffs' theory of motive is not at all contradictory, because it is based on an interest in DPM's maintaining a relationship with SPhinX and PlusFunds in the short term. Accepting the allegations as true, it is not inconsistent for a person to think that in the short term, it would be necessary to go along with Sugrue's and Refco's plan to sweep the cash into RCM. While that could create a long-term risk for SPhinX and PlusFunds, the Plaintiffs allege that the plan was to sell DPM before that longterm risk would come to roost. Notably, DPM was in fact sold for a large sum before the long-term risk to the SMFF excess cash was realized.
Accordingly, the Plaintiffs have sufficiently alleged motive on the part of Aaron and Castranova. And clearly the Amended Complaint alleges that Aaron and Castranova had the opportunity to commit fraud, by their input into the offering memoranda, marketing materials, financial statements, and weekly risk assessments. As stated above, specific and plausible assertions of motive and opportunity can be sufficient to satisfy the Rule 9(b) pleading standards for fraudulent intent. And as stated above in the section on fiduciary duty, the DPM entities are vicariously liable for the acts of Aaron and Castranova.
Even if motive and opportunity has not been sufficiently shown, the Plaintiffs can satisfy the pleading standards for fraudulent intent by stating a plausible case that a defendant knew or must have known the misstatements to be false. American Financial Intern. Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, at *8. In this case the Plaintiffs allege that the extensive functions that DPM had under the Service Agreementespecially given the role in the transfer of cash and the assessment of riskwould inevitably lead to knowledge on the part of DPM (and Aaron and Castranova) that the statements in the subject documents were false. See., e.g., FAC ¶¶ 106, 107, 145.[41] The Plaintiffs also allege that Aaron admitted he knew that the excess cash was being transferred to RCM and that the assets were unprotected there. See, e.g., FAC ¶¶ 137-38.[42] These *529 allegations are sufficiently detailed to raise a plausible inference that DPM, Aaron and Castranova were aware that the statements in the subject documents were fraudulent. Therefore the Plaintiffs have satisfied the Rule 9(b) requirement with respect to fraudulent intent.

c. Attributing Particular Statements to Particular Defendants
"[W]hen a fraud claim is made against multiple defendants, ... a plaintiff is obligated to state, with particularity, the acts [and] omissions complained of by each defendant. General allegations made against multiple defendants do not satisfy the pleading requirements of [Rule] 9(b)." Rafter v. Bank of America, 2009 WL 691929, at *12 (S.D.N.Y.) (internal quotations omitted). See also Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993) (Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to "defendants."); In re Crude Oil Commodity Litigation, 2007 WL 1946553, at *6 (S.D.N.Y.) ("In situations where multiple defendants are alleged to have committed fraud, the complaint must specifically allege the fraud perpetrated by each defendant, and `lumping' all defendants together fails to satisfy the particularity requirement.").
At first glance it would appear that the Plaintiffs have improperly "lumped" Aaron, Castranova and the DPM entities together and have not sufficiently broken out the individual statements attributable to each. But that would be a nonsensical and impossible enterprise in this case. First, the Amended Complaint alleges that Aaron and Castranova were acting on behalf of DPM. Therefore it makes no sense to try to break out individual actions and statements insofar as DPM is concerned. More importantly, the nature of the statements makes it impossible, and unnecessary, to attribute any particular statement to a particular defendant. All of the alleged misstatements are in documents intended for public consumption. The Plaintiffs allege that the Defendants participated in the drafting and preparation of these documents. The documents were allegedly a collective enterprise. None of those documents specifically identify an individual as making any particular statement. Given those circumstances, the Defendants' insistence on individual attribution would result in an inability ever to plead fraud when the preparation of the challenged document is a collective enterprise. If breaking out individual contributions to such a document is required, surely discovery would be necessary before that goal could be met.
The Defendants do not cite any case that has found a pleading of fraud insufficient under Rule 9(b) when the alleged misstatement is made in a document that was allegedly prepared through the efforts of multiple participants identified in the complaint.[43] Indeed the law is to the contrary *530 allegations that individual defendants assisted in the preparation of a collective statement are sufficient to satisfy the attribution requirement of Rule 9(b) without the need to indicate which particular statements are attributable to which particular defendant. See, e.g., American Financial Intern. Group-Asia, L.L.C. v. Bennett, 2007 WL 1732427, at *7 (complaint sufficiently attributed statements to an individual when it alleged that the individual participated in the preparation of the statement; it failed to state a cause of action against other individuals who were not alleged to have participated in the statement's preparation).
Accordingly, the Amended Complaint should not be dismissed on the ground that the Plaintiffs have failed to plead with particularity which defendant made which particular fraudulent statement.

d. Proximate Cause
"To establish a fraud claim, a plaintiff must demonstrate that a defendant's misrepresentations were the direct and proximate cause of the claimed losses." Friedman v. Anderson, 23 A.D.3d 163, 167, 803 N.Y.S.2d 514 (1st Dept.2005). As discussed above in the section on substantial assistance for the claim of aiding and abetting breach of fiduciary duty, the Defendants claim that it was the acts of Refco and corrupt insiders at PlusFunds that caused the damage to SMFF and PlusFunds. The issue here is whether the damages to SMFF and PlusFunds was the "natural and probable consequence of the [Defendants'] misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." Cumberland Oil Corp. v. Thropp, 791 F.2d 1037, 1044 (2d Cir.1986). And for the reasons discussed in that section on breach of fiduciary duty, the Plaintiffs have sufficiently pled that the misstatements of Aaron, Castranova, and the DPM entities proximately caused the damages to SMFF and PlusFunds: because the allegations make a plausible case that if the statements had been accurate, the transfers to RCM would never have been made or would have been discovered and undone by innocent insiders.[44]

3. Rule 9(b) as Applied to the Claim Against Mellon
For the reasons stated previously, the Plaintiffs have not adequately pled a fraud claim against Mellon under Rule 9(b). The Plaintiffs have not and cannot establish a connection to the alleged fraud by either 1) Mellon's promise to bring DPM's performance up to Mellon standards, or 2) Mellon's corporate relationship to the DPM entities. The Plaintiffs do not and cannot allege that Mellon had any individual *531 role in the preparation of the offering materials, weekly risk reports, etc., or in the transfer of excess cash to RCM. Therefore the fraud claim against Mellon should be dismissed with prejudice.

Recommendations:
1. The motions to dismiss Count VIII should be denied with respect to all Defendants except Mellon.
2. Count VIII should be dismissed as to Mellon, with prejudice.

I. Count IXAiding and Abetting Interference With Contract/Prospective Contract (Against All Defendants)
The claims for aiding and abetting interference with contract or prospective contract should be dismissed with prejudice because they suffer from a basic flaw: they do not allege that anyone interfered with the contract (the IMA) or the prospective contract (Lehman Brothers). It is fundamental that a defendant cannot be liable for aiding and abetting unless there is a primary wrong to aid and abet.
The Plaintiffs contend that they have asserted a primary wrong in Count VII, for tortious interference, the terms of which are incorporated by reference in Count DC. Even if that were so, the Special Master concluded that the Plaintiffs have failed to state a primary wrong in Count VII.[45] Therefore, Count IX should, like Count VII, be dismissed in its entirety with prejudice.

Recommendation: Count IX should be dismissed with prejudice.

J. Count XNew Jersey RICO (Against AH Defendants)
The Tenth Count of the Complaint alleges a violation of the New Jersey Racketeer Influenced and Corrupt Organizations Act, N.J.S.A. 2C:41-1 et seq. ("NJRICO") against all the Defendants. The Plaintiffs assert that the Defendants committed a direct RICO violation pursuant to N.J.S. 2C:41-2(c) ("Section c") and conspired to commit a RICO violation pursuant to 2C:41-2(d) ("Section d"). The Plaintiffs allege that each of the Defendants are "persons" as defined by N.J.S. 2C:41-1b, and "[i]t was these `persons' common purpose in using and operating the DPM Enterprises to allow the transfer of SPhinX money to be moved from segregated and protected accounts at Refco LLC to unregulated and unprotected accounts at RCM." (FAC ¶¶ 404, 405, 407). The Defendants bring motions to dismiss under Section c and Section d of NJRICO, and for the reasons set forth below, those motions should be granted.
"The New Jersey courts reject a narrow interpretation of the federal civil RICO statute and instead take a liberal stance in allowing plaintiffs to plead NJRICO violations." Ford Motor Co. v. Edgewood Props., Inc., 2009 WL 150951, at *10 (D.N.J.) (citing State v. Ball, 268 N.J.Super. 72, 104, 632 A.2d 1222 (App.Div.1993)), aff'd, 141 N.J. 142, 661 A.2d 251 (1995)). See also Maxim Sewerage Corp. v. Monmouth Ridings, 273 N.J.Super. 84, 90, 640 A.2d 1216, 1218 (N.J.Super.L.1993) (denying leave to amend the federal RICO pleadings, but granting leave to amend the NJRICO claim). However, "[s]ince the NJRICO statute is predicated upon its *532 federal cousin, Title DC of the Federal Organized Crime Control Act of 1970, 18 U.S.C.A. §§ 1961-1968, courts should seek guidance from those decisions." Ford Motor Co., 2009 WL 150951, at *10 (citing Ball, 268 N.J.Super. 72, 632 A.2d 1222).

1. Direct Violations of NJRICO (N.J.S.A. 2C:41-2c)
Section c of NJRICO provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." N.J.S.A. 2C:41-2(c). Thus, pursuant to Section c, the Plaintiffs must establish the following five elements:
(1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce;[46] (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; (5) that he or she participated through a pattern of racketeering activity.
Ford Motor Co., 2009 WL 150951, *10 (citing N.J.S.A. 2C:41-2c). In addition, the Plaintiffs must prove their injury was proximately caused by the Defendants' NJRICO violations. Id.

a. Allegations of an "Enterprise" within the Meaning of N.J.S.A. 2C:41-1
In order to plead a NJRICO violation, the Plaintiffs must plead the existence of an "enterprise." Under N.J.S.A. 2C:41-1c, an "[e]nterprise" is defined as "any individual, sole proprietorship, partnership, corporation, business or charitable trust, association, or other legal entity, any union or group of individuals associated in fact, although not a legal entity, and it includes illicit as well as licit enterprises and governmental as well as other entities." The Plaintiffs identify DPM, DPM-Mellon, Mellon, Aaron, and Castranova as the liable RICO "persons" within the meaning of N.J.S.A. 2C:41-1b. Further, the Plaintiffs claim that these Defendants, along with other persons, operated an enterprise "consisting of DPM, DPM-Mellon, Mellon and their subsidiary and affiliated companies." (FAC ¶¶ 404-05). In the alternative, the Plaintiffs claim that DPM, DPM-Mellon, Mellon, Aaron, and Castranova constituted an "association-in-fact" enterprise. (FAC ¶ 406).
"[C]ourts have not found any one uncontroversial definition of `enterprise.'" Ball, 661 A.2d at 260. There are two main issues that arise at the pleading stage. First, some courts require that the "enterprise" be distinct from the named RICO "persons," and second, the alleged enterprise must have sufficient "organization."
Under federal RICO, the enterprise and the defendants must be sufficiently distinct. See Ford Motor Co., 2009 WL 150951, at *10. The federal distinctness requirement is known as the Enright rule, named after Hirsch v. Enright Refining Corp., 751 F.2d 628, 633 (3d Cir.1984), which held that the "person" charged with the RICO violation cannot be the same entity as the "enterprise" under section 1962(c). By contrast, the New Jersey courts have determined that NJRICO is broader than its federal counterpart in defining "enterprise." Ford Motor Co., 2009 WL 150951, at *11; see Ball, 661 *533 A.2d at 260-61. Rejecting the Enright rule, NJRICO allows a plaintiff to name the enterprise and the various individuals who constitute that enterprise as the defendants. See Maxim Sewerage Corp., 640 A.2d at 1221; Ford Motor Co., 2009 WL 150951, at *11.[47]
Because there is no distinctiveness requirement under NJRICO, Count X cannot be dismissed for including the named defendants as constituting the alleged enterprise.
The second "enterprise" issue is whether the enterprise had sufficient "organization." The leading New Jersey case on the "organization" requirement is State v. Ball, supra, where the court described the requirement in the following passage:
The organization of an enterprise need not feature an ascertainable structure or a structure with a particular configuration. The hallmark of an enterprise's organization consists rather in those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose. The division of labor and the separation of functions undertaken by the participants serve as the distinguishing marks of the "enterprise" because when a group does so divide and assemble its labors in order to accomplish its criminal purposes, it must necessarily engage in a high degree of planning, cooperation and coordination, and thus, in effect, constitute itself as an "organization."
* * * Thus, evidence showing an ascertainable structure will support the inference that the group engaged in carefully planned and highly coordinated criminal activity, and therefore will support the conclusion that an "enterprise" existed. Apart from an organization's structure as such, however, the focus of the evidence must be on the number of people involved and their knowledge of the objectives of their association, how the participants associated with each other, whether the participants each performed discrete roles in carrying out the scheme, the level of planning involved, how decisions were made, the coordination involved in implementing decisions, and how frequently the group engaged in incidents or committed acts of racketeering activity, and the length of time between them.
661 A.2d at 261.
It is apparent that the Plaintiffs have not sufficiently pled an "organization" under NJRICO given the standards articulated in Ball. Nothing in the Amended Complaint describes how the members of the enterprise "associated with each other"; whether the participants "performed discrete roles"; "the level of planning involved"; "how decisions were made"; or "the coordination involved in implementing decisions." There is nothing at all in the Amended Complaint about "division of labor" or "separation of functions." *534 No inference can be derived that the Defendants collectively engaged in a "high degree of planning, cooperation and coordination." Essentially all that is said in the Amended Complaint about the organization of the enterprise with regard to the predicate acts is that all of the Defendants agreed to make misrepresentations in financial statements and risk reports. The Amended Complaint does, as discussed above, allege that Aaron and Castranova helped to prepare these statements, but it says nothing about division of labor, who agreed to do what, or whether they coordinated their activity between themselves or with other members of the enterprise. In short there is nothing in the Amended Complaint to indicate that the members of the alleged enterprise actually operated as a group.
It is true that the Plaintiffs do not have to plead that the enterprise had a formal structure. Pavlov v. Bank of New York Co., 25 Fed.Appx. 70, 71 (2d Cir.2002) (the enterprise need not have a "structural hierarchy"). But under Ball there must be some allegations that indicate "a high degree of planning, cooperation and coordination"and the Amended Complaint is sorely lacking in such allegations. See, e.g., Cedar Swamp Holdings, Inc. v. Zaman, 487 F.Supp.2d 444, 450 (S.D.N.Y. 2007) ("merely stringing together a list of defendants and labeling them an enterprise is insufficient to state a RICO claim"); Moll v. U.S. Life Title Ins. Co. of New York, 654 F.Supp. 1012, 1031 (S.D.N.Y.1987) ("Plaintiffs' complaints do charge generally that the members of the alleged enterprise shared common purposes * * *. However, defendant is correct that plaintiffs fail to specify how these members joined together as a group to achieve these purposes. * * * Conspicuously absent from the complaints are any factual allegations regarding the continuity of structure or personnel of this group."). Compare Aiu Insurance Co. v. Olmecs Medical Supply, Inc., 2005 WL 3710370, at *7 (E.D.N.Y.). (enterprise sufficiently pled where the complaint specified "in detail each defendant's necessary and symbiotic contribution to the overall scheme" and described "the distinct roles of each category of defendant").
Accordingly, the Plaintiffs have failed to plead with sufficient particularity that the Defendants operated as an organization, and therefore have failed to plead the requirement of an enterprise under NJRICO. The Special Master will consider the other elements of the NJRICO claim, however, in case the Court decides that the Plaintiffs have in fact sufficiently pled the organization requirement.

b. The Existence of a "Pattern of Racketeering"
To be held liable under NJRICO, a defendant's involvement in an enterprise must be consummated "through a pattern of racketeering activity." N.J.S.A. 2C:41-2c. A "pattern of racketeering activity," requires:
(1) Engaging in at least two incidents of racketeering conduct one of which shall have occurred after the effective date of this act and the last of which shall have occurred within 10 years (excluding any period of imprisonment) after a prior incident of racketeering activity; and (2) A showing that the incidents of racketeering activity embrace criminal conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.
N.J.S.A. 2C:41-1d.
The Defendants do not contest the Plaintiffs' pleading of a pattern of racketeering, and in any case the pleading of a *535 pattern is sufficient. Unlike the federal RICO statute, which requires a showing that the predicate acts are both related and continuous, NJRICO is "broader in scope" and only requires a showing of relatedness. Ball, 661 A.2d at 263, 265. Each of the Defendants' alleged mail or wire acts, which are discussed below, occurred after the effective date of the statute, within ten years of one another, and each constitutes a predicate act, as defined by the statute. Therefore, the Plaintiffs have adequately pled a "pattern of racketeering."

c. Proximate Cause
The Plaintiffs allege that the Financial Statements and Risk Management Summaries contained material misrepresentations on which SPhinX and PlusFunds relied. (FAC ¶¶ 413, 417). As with the claims for breach of fiduciary duty and fraud, the Defendants assert that the Plaintiffs' NJRICO claim fails to satisfy the "proximate cause" requirement, because the cause of the damages was Refco's collapse and the wrongdoing by corrupt insiders at PlusFunds.[48]
The Defendants correctly note that the proximate causation standard for RICO claims is more restrictive than the common law tort standard. See Lerner v. Fleet Bank, N.A., 459 F.3d 273, 285 n. 5 (2d Cir.2006) ("In practice, our cases have held RICO plaintiffs to a more stringent showing of proximate cause than would be required at common law."). The court in Baisch v. Gallina, 346 F.3d 366, 373-374 (2d Cir.2003) set forth the more stringent proximate cause standard [described in Lerner, supra] as follows:
First, the plaintiffs injury must have been proximately caused by a pattern of racketeering activity violating 18 U.S.C. § 1962 or by individual RICO predicate acts. In other words, a plaintiff does not have standing if he suffered an injury that was indirectly (and hence not proximately) caused by the racketeering activity or RICO predicate acts, even though the injury was proximately caused by some non-RICO violations committed by the defendants. In Lerner, the plaintiffs injuries were proximately caused not by the racketeering activity itself, but by the defendant's violation of state reporting requirements, which were not RICO predicate acts under § 1961(1). Thus the plaintiffs lacked standing.
Second, the plaintiff must have suffered a direct injury that was foreseeable: "Central to the notion of proximate cause [under RICO] is the idea that a person is not liable to all those who may have been injured by his conduct, but only to those with respect to whom his acts were a substantial factor in the sequence of responsible causation, and whose injury was reasonably foreseeable or anticipated as a natural consequence." Lerner, 318 F.3d at 123. As an elaboration of this second prong relating to the directness of the injury, Lerner noted that "the reasonably foreseeable victims of a RICO violation are the targets, competitors and intended victims of the racketeering enterprise."
See also Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir. 1990) ("A proximate cause is not * * * the same thing as a sole cause. Instead, a factor is a proximate cause if it is a substantial *536 factor in the sequence of responsible causation.").
There are a number of cases that are instructive on how to apply the RICO requirement of proximate causation. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992), the SIPC brought a RICO claim for damages resulting from its having to reimburse customers of certain registered broker-dealers, when the broker-dealers could not meet their financial obligations due to a stock manipulation scheme. The court held the customer plaintiffs were only harmed indirectly because none of them had purchased the manipulated stock; rather, they were injured only by virtue of the brokerage firms' subsequent bankruptcy. The alleged conspiracy only directly harmed the broker-dealers, and SIPC's injury was "purely contingent" on that harm.[49]Id. at 271, 112 S.Ct. 1311. In Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006), the plaintiff claimed that the defendant, its business competitor, defrauded the State by not paying sales tax and using the savings to charge lower prices, which in turn harmed the plaintiffs business. The court found no proximate cause, because the defendant's conduct directly harmed the State, while the plaintiff was only indirectly harmed. In Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), a RICO action was brought by regular bidders at a county's auction of tax liens. The bidders alleged that defendants, also regular bidders, were able to obtain a higher share of valuable liens by lying to the county in order to circumvent a rule that would otherwise result in a more equitable distribution of liens. Here, the Court found proximate cause because it was a natural consequence that the defendants' collection of more liens for themselves would leave their competitors fewer liens. In other words, every gain by the defendants directly caused a loss to the plaintiffs, regardless of the means the defendants used to deceive a third party. These cases collectively require a plaintiffs injuries to be directif there is an intermediate victim, then the plaintiffs injuries are indirect and a RICO claim must be dismissed.
An injury can be direct even if the plaintiff is not the only target of the defendant's misconduct. Thus, in Baisch v. Gallina, 346 F.3d 366 (2d Cir.2003), a plaintiff made loans to contractors that were performing construction projects with Nassau County. The contractor defrauded the County by submitting false statements and expense vouchers. The plaintiffs' loans essentially propped up the contractors so that they could continue to defraud the county. Eventually the contractors declared bankruptcy. The district court had declined to find proximate cause, because the fraudulent scheme was directed against the County. But the Second Circuit reversed and stated "the fraud against [the] County was the basis for the fraud against [the plaintiff] that led to his injury. The frauds against [the plaintiff] and those against *537 [the] County were not just linked; they were intertwined as coordinated parts of one racketeering enterprise." Id. at 374. The court elaborated as follows:
No precedent suggests that a racketeering enterprise may have only one "target," or that only a primary target has standing. * * * The defendants specifically targeted Baisch as their victim allegedly by taking his loans under false pretenses and consciously creating a high risk of defaulting on those loans.
Id. at 375.
Here, the Plaintiffs' allegations meet RICO's proximate causation requirement. The Defendants argue that the cause of Plaintiffs' loss was Refco's collapse and that DPM Defendants' role was "secondary at best." However, Refco's collapse and DPM's alleged misconduct are "intertwined.". RICO case law provides that there does not have to be only one cause, as long as the defendant's conduct is a "substantial factor" directly leading to the injury. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1399 (11th Cir.1994) ("If the defendant's conduct was a substantial factor in causing the plaintiffs injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.") (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41, at 268 (5th ed. 1984)). The Plaintiffs clearly, and throughout the Amended Complaint, allege that SMFF's excess cash was the target of the scheme.
The Defendants do not and cannot argue that the Plaintiffs' injury is derivative. Indeed, as discussed in the Report and Recommendation on Standing entered in Krys v. Sugrue and affirmed by the Court, both SMFF and PlusFunds suffered direct injury from the alleged unauthorized transfers of excess cash to RCM. As to this injury, there is no intermediate party that is better situated to seek recovery. Whether the Defendants actually caused the damages to SMFF and PlusFunds is a question of fact that is appropriately addressed at a later stage in the proceedings. Marjac, LLC v. Trenk, 2006 WL 3751395, at *10 n. 8 (D.N.J.).[50]
The Defendants rely on In re Parmalat Sec. Litig., 501 F.Supp.2d 560, 580 (S.D.N.Y.2007), in which the court dismissed a NJRICO claim, as well as others, for lack of causation. The plaintiffs in Parmalat alleged that if accountants had not misrepresented the financial condition of a company, then innocents at the company would not have allowed a fraudulent transaction in a related company to go forward. Judge Kaplan explained the nuances of proximate cause in the following passage:
It is reasonably foreseeable that misrepresenting a company's financial condition, and thus hiding from its innocent managers that the company is being driven into the ground, will cause the *538 company harm. But it is significantly less foreseeable that doing so will cause a subsidiary with which the defendant has no contact to enter into a transaction of which the defendant has no knowledge and that the subsidiary subsequently will be injured when the proceeds are upstreamed to the parent and looted by its corrupt insiders. In other words, even assuming plaintiffs adequately have alleged that defendants helped perpetuate the Parmalat fraud, they have not alleged that it was foreseeable that the assets of one of Parmalat's subsidiaries would get swept into that scheme and looted and that the Companies thus would be injured.
In this case, the Plaintiffs are not alleging that the Defendants committed a wrong that caused a fraud up the ladder in a related company. Rather they are alleging that their fraudulent acts caused the innocents at PlusFunds and SPhinX to believe that the excess cash was protected from risk of a Refco bankruptcy when in fact it was not. That is an allegation of direct and not attenuated cause when coupled with the assertion that if the innocents had known the true state of affairs, they would have acted to protect the cash in accordance with the SPhinX business plan.
In sum, the Plaintiffs have sufficiently pled proximate cause under NJRICO.

d. Allegations of Mail or Wire Fraud Subject to Heightened Pleading Standards
The Defendants contend that the Plaintiffs failed to adequately plead predicate acts of mail or wire fraud. NJRICO defines "[r]acketeering activity" as crimes under the laws of New Jersey or equivalent crimes under the laws of any other jurisdiction, N.J.S.A. 2C:41-1(a)(1), or any conduct defined by the federal statutory definition of "racketeering activity." N.J.S.A. 2C:41-1(a)(2). "To allege mail or wire fraud, a plaintiff must describe: (1) the existence of a scheme to defraud, (2) the use of the mails or wires in furtherance of the fraudulent scheme, and (3) culpable participation by the defendants." Ford Motor Co., 2009 WL 150951, at *15 (quoting Emcore Corp. v. PricewaterhouseCoopers LLP, 102F.Supp.2d 237, 245 (D.N.J.2000)).[51] The pleading requirement for predicate acts is to be liberally applied. See, e.g., Ford Motor Co., 2009 WL 150951, at *17 (NJRICO requirements for pleading predicate acts should be applied liberally, because it is the purpose of discovery "to fill in the details."). See also In re Schering-Plough Corp., 2009 WL 2043604, at *7 (D.N.J.) (courts should "apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.").
The Plaintiffs allege that the Defendants committed acts of mail or wire fraud by mailing the financial statements to SPhinX and by electronically transmitting the weekly risk reports to the PlusFunds risk committee. (FAC ¶ 413). The Defendants argue that these allegations are insufficient under Rule 9(b). But for the reasons discussed in the analysis of the fraud claim in Count VII, the Special Master concludes that the Plaintiffs have satisfied the Rule 9(b) particularity requirements with respect to scienter, attribution, *539 timing, content, and relianceas to all Defendants other than Mellon.[52]
The only point not discussed under Count VIII (because it was unnecessary to do so) is whether the Plaintiffs have sufficiently pled that the fraudulent activity constituted mail or wire fraud. The Defendants do not dispute the Plaintiffs' allegations concerning mailing and wiring, nor could they, as FAC ¶ 413 specifically states that the various misrepresentations were either made by mail or electronically. Therefore, the Plaintiffs have sufficiently alleged predicate acts of mail and wire fraud under NJRICO with respect to all defendants other than Mellon.
For reasons discussed throughout this Report and Recommendation, the NJRICO claim against Mellon should be dismissed with prejudiceeven if the court finds that the Plaintiffs have sufficiently pled an enterprise with respect to the other Defendants. The examples of Mellon's control provided in the Amended Complaint are not even close to sufficient to establish actual control over the conduct of DPM-Mellon, and neither is the fact that Mellon appointed the majority of the DPM-Mellon board. The alleged promise that Mellon would bring DPM up to Mellon standards had nothing to do with the acts that are the gravamen of the NJRICO claim. And the Amended Complaint contains no allegations that Mellon knowingly engaged in predicate acts to further the enterprise. Nor can Mellon be held vicariously liable for the actions of any of the other Defendants. See generally Gruber v. Prudential-Bache Sec., Inc., 679 F.Supp. 165, 181 (D.Conn.1987) (vicarious liability under RICO is limited, and dependent on "the number of high-level employees involved in the racketeering activity, their degree of participation in the racketeering activity, whether these high-level employees themselves committed the alleged predicate acts, and whether the corporation directly and substantially benefitted from the racketeering activity").

2. Conspiracy Violations of NJRICO (N.J.S.A. 2C:41-2d)
The Plaintiffs also bring a conspiracy allegation pursuant to N.J.S.A. 2C:41-2d, which provides: "It shall be unlawful for any person to conspire as defined by N.J.S. 2C:5-2, to violate any of the provisions of this section." N.J.S.A. 2C:41-2(d). To plead a violation of section (d), the Plaintiffs "must do more than allege an agreement to commit the predicate acts." Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F.Supp. 435, 451 (E.D.N.Y.1997). The Plaintiffs must also allege facts from which the court could infer the existence of that agreement and that the Defendants "understood the scope of the enterprise and knowingly agreed to further its affairs through the commission of various offenses." Morin v. Trupin, 711 F.Supp. 97, 111 (S.D.N.Y. 1989). Lastly, in order to prove a conspiracy to violate RICO, the defendant must have acted "knowingly and purposely," Maxim Sewerage Corp., 640 A.2d at 1220. It is sufficient if the defendant knows the general purpose of the enterprise and that it extends beyond his role. Ball, 661 A.2d at 268.
The more liberal pleading requirements of Rule 8(a) are applicable to pleading *540 of the elements of a RICO conspiracy. Hecht, 897 F.2d at 26, n. 4 ("Hecht's pleading of a conspiracy, apart from the underlying acts of fraud, is properly measured under the more liberal pleading requirements of Rule 8(a)."). But even under the more liberal pleading standards of Rule 8, the Plaintiffs here fail to allege, with any kind of specificity, the necessary agreement among the Defendants. Paragraph 412 of the Amended Complaint simply declares that the Defendants and other persons "agreed to conduct or participate in the conduct of the `DPM Enterprises.'" That bald assertion is plainly insufficient. See generally Congregacion de la Mision Provincia de Venezuela v. Curi, 978 F.Supp. at 451 (RICO conspiracy claims dismissed where "plaintiffs make the conclusory allegation that `Valdes, Miriam and each of the defendants consciously entered into an agreement to commit at least two acts of racketeering in furtherance of the scheme to defraud, steal and embezzle money from the plaintiffs' [and] `knowingly entered into agreements with each other to engage in the formation and operation of several conspiracies in which defendants committed the predicate acts of racketeering.'"); Adler v. Berg Harmon Associates, 790 F.Supp. 1222, 1234 (S.D.N.Y.1992) (RICO conspiracy allegations dismissed where plaintiffs made "no factual allegations supporting an inference that the various defendants consciously agreed to become part of a RICO conspiracy"); Nasik Breeding & Research Farm Ltd. v. Merck & Co., 165 F.Supp.2d 514, 541 (S.D.N.Y. 2001) ("[M]ere knowledge of a scheme, even coupled with personal benefit, is not enough to impose liability for a RICO conspiracy").
The Plaintiffs cite a number of cases for the proposition that the pleading requirements for a RICO conspiracy are not demanding and that it is sufficient to allege that the defendants knew of the general nature of the RICO conspiracy. See, e.g., Madanes v. Madanes, 981 F.Supp. 241, 259 (S.D.N.Y.1997), which states that "it is axiomatic that the proof required to show that a defendant knowingly associated with an existing conspiracy need not be overwhelming... Indeed, participation in the conspiracy can be shown entirely through circumstantial evidence." But in this case the Plaintiffs have not provided any factual assertion that would even establish circumstantially that the Defendants had knowingly entered into a conspiracy. If all that is required is a broad assertion that "the defendants agreed," then any kind of particularity requirement, even the lesser requirement of Rule 8, is essentially thrown out the window. The cases discussed above find such broad conclusions to be insufficient and accordingly the Plaintiffs' NJRICO conspiracy claim should be dismissed.[53]

Summary of Analysis on Count X.
The Plaintiffs have failed to sufficiently allege the organization required for the "enterprise" element of NJRICO. And the Plaintiffs have also failed to sufficiently allege a conspiracy claim under NJRICO section (d).
The remaining question is whether the dismissal of Count X should be with prejudice. The Plaintiffs have already had an opportunity to amend the Complaint. And in their proposed Second Amended Complaint, the allegations regarding enterprise and conspiracy are exactly as bare and conclusory as in the First Amended Complaint. See, e.g., Kropelnicki v. Siegel, 290 *541 F.3d 118, 130-131 (2d Cir.2002) (court considers proposed amended complaint in deciding whether leave to amend should have been granted). Under the circumstances it is appropriate to recommend that the RICO Count X be dismissed with prejudice. And in any case, Count X should be dismissed as to Mellon with prejudice.

Recommendation:

Count X should be dismissed in its entirety, with prejudice.

IV. Conclusion
In accordance with the Report above, the Special Master recommends the following with respect to the motions to dismiss by the Defendants:[54]

Count I, Breach of Contract:
1. Count I should be dismissed as to Aaron and Castranova, with prejudice.
2. The claim that Mellon is liable for breaching the Service Agreement should be dismissed with prejudice.
Count II, Breach of the Covenant of Good Faith and Fair Dealing
Count II should be dismissed with prejudice.
Count III, Indemnity
Count III should be dismissed as to Mellon, with prejudice.
Count IV, Declaratory Relief
Count IV should be dismissed as to Castranova, with prejudice.
Count V, Breach of Fiduciary Duty
1. The DPM entities' motion to dismiss should be denied.
2. PlusFunds' claim against Aaron should be dismissed, with prejudice.
3. Aaron's motion to dismiss SMFF's claim should be denied.
4. Count V should be dismissed as to Castranova, with prejudice.
5. Count V should be dismissed as to Mellon, with prejudice.
Count VI, Aiding and Abetting Breach of Fiduciary Duty
1. The motions to dismiss should be denied with respect to all Defendants except Mellon.
2. Count VI should be dismissed as to Mellon, with prejudice.
Count VII, Interference with Contract/Prospective Contract
Count VII should be dismissed with prejudice.
Count VIII, Fraud/Misrepresentation
1. The motions to dismiss should be denied with respect to all Defendants except Mellon.
2. Count VIII should be dismissed as to Mellon, with prejudice.
Count IX, Aiding and Abetting Interference with Contract/Prospective Contract
Count IX should be dismissed with prejudice.
Count X, NJRICO
Count X should be dismissed with prejudice.
July 19, 2010.
NOTES
[1] The facts surrounding what has been called "the Refco fraud" have been recounted in a number of opinions by Judge Lynch (see, e.g., Kirschner v. Grant Thornton, 2009 WL 1286326 (S.D.N.Y.2009)) and in a number of R and R's by the Special Master. To the extent necessary far background on the instant motions, familiarity with the financial schemes of Refco is presumed.
[2] On November 10, 2009, pursuant to an Order of the Grand Court of the Cayman Islands, Margot MacInnis was appointed as successor to Christopher Stride, as Joint Official Liquidator of the SPhinX funds.
[3] On November 24, 2009, Kenneth M. Krys was appointed as successor to James P. Sinclair, as Trustee of the SPhinX Trust, by the Advisory Board created by the PlusFunds Plan. Effective May 1, 2010, by a resolution of the Advisory Board dated March 31, 2010, Peter Andersen of The Harbour Trust Co. Ltd. was appointed as successor Trustee of the SPhinX Trust, in place of Kenneth M. Krys. Subsequently, effective May 1, 2010, by a resolution of the Advisory Board dated June 3, 2010, and superseding the resolution of March 31, 2010, The Harbour Trust Co. Ltd. was appointed successor Trustee for the SPhinX Trust, in place of Kenneth M. Krys. By order of Special Master Ronald Hedges, dated June 17, 2010, the substitution of Margot MacInnis, as Joint Official Liquidator and assignee of claims assigned by certain SPhinX funds investors, in place of Christopher Stride, and the substitution of The Harbour Trust Co. Ltd., as SPhinX Trustee, were effectuated. The order also directed the amendment of the caption for this action, Krys, et al. v. Aaron, et al., 08-cv-7416, to reflect the appearance of Margot MacInnis, as a Joint Official Liquidator and as assignee of claims assigned by certain SPhinX fund investors, and the appearance of The Harbour Trust Co. Ltd., as SPhinX Trustee.
[4] The Defendants do not contest that SMFF has standing.
[5] In addition, all the Defendants except Aaron are represented by the same counsel and refer to themselves as "the DPM Defendants." This Report and Recommendation will refer to them accordingly.
[6] The Amended Complaint alleges that in 2006, DPM-Mellon purported to enter into a restated Service Agreement that omitted the duty to provide treasury functions and invest SPhinX's excess cash. The Plaintiffs contend that this restated agreement has no effect because not properly authorized by SPhinX or PlusFunds. FAC ¶¶ 121-22.
[7] The parties agree that New York law governs the Plaintiffs' breach of contract and breach of implied covenant claims that are set forth in Counts I-III.
[8] The DPM Defendants state that they intend to file a motion for summary judgment at the appropriate time. Brief in Support of Motion to Dismiss at 17 n. 10.
[9] The Service Agreement is obviously integral to the Plaintiffs' complaint and so its terms may be considered on a motion to dismiss. See Yak v. Brussels Lambert, 252 F.3d 127 (2d Cir.2001) (document referred to in the complaint and in the possession of the plaintiff may be considered on a motion to dismiss). Moreover, in oral argument the Plaintiffs' counsel conceded that the Service Agreement may be considered in evaluating the motions to dismiss. Transcript of Oral Argument on DPM Motion to Dismiss, January 15, 2010 at 94 ("And I don't care if you look at the service agreement either.").
[10] See Report and Recommendation dated March 1, 2010 (finding that the Plaintiffs in Krys v. Sugrue had adequately pled breach of fiduciary duty claims on some grounds but not others); Report and Recommendation dated June 3, 2010 (finding that the Refco Trustee in the Private Action Trust case had not sufficiently pled a breach of fiduciary duty).
[11] Compare Pension Committee of University of Montreal Pension Plan v. Banc of America Sec, LLC, 591 F.Supp.2d 586, 589-90 (S.D.N.Y.2008) ("The elements of a claim for breach of fiduciary duty under New York law are breach by a fiduciary of a duty owed to plaintiff; defendant's knowing participation in the breach; and damages."), with ACE American Ins. Co. v. Wachovia Ins. Agency, 2008 WL 4630486, at *6 (D.N.J.2008) ("New Jersey requires the following elements to establish a breach of fiduciary duty: a fiduciary relationship between the parties, breach of the duty imposed by that relationship, and harm to the plaintiff." (internal citations omitted)).
[12] There is a good argument that Paget-Brown does not reject the concept of vicarious liability for the acts of a director appointed to represent its interest on the board of another corporation. In that case the respondent's shareholders had the power to remove the director. So the court could have reasoned that the director was operating as the respondent's and not the appellant's agent. That question need not be resolved, however, because as seen below in text, Cayman law is not applicable here.
[13] The parties do not cite a New Jersey case on the substantive question of vicarious liability for an appointed director. In the absence of any indication to the contrary, it will be assumed that New Jersey law is the same as New York lawand the law of other American jurisdictions (see Sunbeam, supra, in text). The parties do not claim that there is any difference between New York and New Jersey law on the subject.
[14] It follows that DPM is vicariously liable for Castranova's acts as well. DPM does not argue otherwise.
[15] DPM contends that the risk reports were limited to disclosure of "counterparty risk" not the risk of assets being placed in a commingled account. "Counterparty risk" refers only to the risk that one of the parties to a transaction will not be able to complete it. See Transcript of Oral Argument at 240-41. The Plaintiffs contend that "counterparty risk" includes "whoever is on the other side of a transaction" and this would include the risk posed by RCM's insolvency. This dispute over the interpretation of the risk reports presents a question of fact. The meaning of an ambiguous term should not be decided even on a motion for summary judgment, much less on a motion to dismiss. See, e.g., Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2d Cir.1990). ("Summary judgment normally is inappropriate when a contractual term is ambiguous because a triable issue of fact exists as to its interpretation."); CBS, Inc. v. Ahern, 108 F.R.D. 14, 24 (S.D.N.Y.1985) (claim that plaintiff mischaracterized the documents on which he relied raises a factual question that should be resolved at trial or on summary judgment).
[16] The EBC I, court emphasized that whether a relationship of trust and confidence exists beyond an ordinary commercial relationship is a "fact-specific determination to be made by the factfinder." Id. at n. 5.
[17] DPM claims that cases in the hedge fund and investment context routinely find that the administrators are not fiduciaries. (MTD Def. Br. 26-27). DPM relies on Jordan (Bermuda) Investment Co. v. Hunter Green Investments LLC, 2007 WL 2948115 (S.D.N.Y. Oct. 3, 2007), in which the court granted summary judgment on a breach of fiduciary claim, where the defendant was an administrator that computed NAVs. However, the court in Jordan based its holding on the following specific facts: (1) the plaintiff had no agreement with the administrator Defendant; (2) the plaintiff admitted that he had no contact with Defendants other than the receipt of periodic account statements; and (3) the plaintiff admitted that it never even relied on those statements, as it hired its own counsel to conduct due diligence. Notably, the case was decided on summary judgment, not on a motion to dismiss. DPM also relies on Scionti v. First Trust Corp., 1999 U.S. Dist. LEXIS 23253, at *131-32 (S.D.Tex.), and Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC, 376 F.Supp.2d 443, 447-48 (S.D.N.Y.2005), for the notion that no fiduciary duty exists where the defendants merely calculate NAVs and provide nondiscretionary administrative services. But in this case the Plaintiffs have plausibly alleged much more extensive, and discretionary, duties.
[18] The Defendants cite to Kirschner v. Bennett, 648 F.Supp.2d 525, 536 n. 16 (S.D.N.Y. 2009), where Judge Lynch held that RCM did not owe a fiduciary duty to its foreign exchange customers where the Trustee did not allege a duty based on "transformative special circumstances." However, the Defendants' argument is inapposite, because Judge Lynch's holding described a broker's duty to its customers, which is assessed under different case law. See de Kwiatkowski v. Bear, Stearns & Co., Inc., 306 F.3d 1293, 1308-09 (2d Cir.2002). See generally Report and Recommendation of the Special Master dated June 3, 2010 in Kirschner v. Bennett for a discussion of the case law governing fiduciary duty of brokers. In the instant case, DPM is a hedge fund administratornot a brokerand therefore, Kirschner does not apply. Whether DPM had a relationship of trust and confidence with SPhinX and PlusFunds is properly assessed by the case law cited in text.
[19] The IMA is integral to the complaint indeed it is the source of one of the tortious interference claimsand so may be considered on a motion to dismiss. See Yak v. Brussels Lambert, 252 F.3d 127 (2d Cir.2001) (document referred to in the complaint and in the possession of the plaintiff may be considered on a motion to dismiss). And counsel's statement before Judge Drain may be judicially noticed for the fact that it was made. See Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2nd Cir.1993); Fed.R.Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding.").
[20] Aaron and the Plaintiffs tussle over whether the breach of fiduciary duty claim is subject to the heightened pleading standards of Rule 9(b). The breach of fiduciary claims do at least in part sound in fraud because the Plaintiffs are arguing that the Defendants wrongfully swept the funds into RCM and continually misrepresented that fact. On the other hand, some of the breach of fiduciary claims concern Aaron's failure to comport with his fiduciary duties as a director. In Soley v. Wasserman, 2010 WL 931888, at *7-8 (S.D.N.Y.), the court held that a court must assess each ground underlying a breach of fiduciary duty claim, and apply Rule 9(b) to those grounds sounding in fraud and Rule 8 to those that do not. Plaintiff in Soley brought a fiduciary duty claim based on two allegations: (1) that defendant breached his fiduciary duty by making numerous misrepresentations; and (2) that defendant breached his fiduciary duty as plaintiff's investment advisor and trusted confidant. The court applied Rule 9(b) to the first allegation and Rule 8 to the second.

In the instant case, the Special Master finds that the allegations of fraud are pleaded with sufficient particularity under Rule 9(b)see the discussion of Count VIII, infra. Moreover, the Plaintiffs have, under Rule 9(b), sufficiently described the acts committed by Aaron that damaged them. As to the claims of breach of fiduciary duty not grounded on fraud, the Plaintiffs have sufficiently alleged Aaron's actions and misconduct.
[21] Under this line of reasoning, Castranova may be liable for any fraudulent statements he made, but would not automatically be liable for breach of fiduciary duty.
[22] Notably, the fiduciary duty claims against Castranova are all grounded in fraud and so subject to the heightened particularity requirements of Rule 9(b).
[23] For reasons discussed in Section TV A., supra, 1) there is no plausible claim that Mellon succeeded to the Service Agreement, and therefore any allegations of a fiduciary relationship arising from the Service agreement are similarly wanting; and 2) there is no plausible claim that Mellon is liable for DPM's conduct under any theory of attribution or piercing the corporate veil.
[24] At oral argument, Plaintiffs' counsel theorized that the promise to more accurately calculate NAVs would have led to disclosure of excess cash at risk in unsegregated accounts, because such risk would be a factor in asset valuation. But DPM's counsel cogently noted that calculation of NAV's does not involve a subjective valuation of the risk of insolvency of a custodian of the funds. See Transcript of Oral Argument at 247. In any case, the Plaintiffs have not pursued the argument that accurate calculation of NAV's would have uncovered the fact that the excess cash was in an unprotected account, and so that argument is no ground for finding a breach of fiduciary duty on Mellon's part. (Again, if correct calculation of NAV's had resulted in disclosure of the relevant risk in this case, then nobody at PlusFunds would have been complaining about the miscalculation).
[25] Paragraph 358 of the First Amended Complaint could be read to posit a nonsensical notion with respect to Aaron. When edited to specifically refer to Aaron, it reads: "Aaron * * * substantially assisted in the breach of fiduciaries by Aaron * * *." It should not require citation to state that a person cannot be liable for aiding and abetting his own breach of fiduciary dutythat would certainly be double-counting. To the extent the First Amended Complaint could be read to allege such a claim, that claim must be dismissed.
[26] Objections to the Special Master's determination of Refco's fiduciary duty are currently before Judge Rakoff. If Judge Rakoff disagrees with the Special Master, then it would follow that the claims in Count VI for aiding and abetting Refco's breach of duty would have to be dismissed for absence of a primary wrong.
[27] The parties use New York and New Jersey cases interchangeably on the question of aiding and abetting. There is no conflict of law between New York and New Jersey law on aiding and abetting breach of fiduciary duty. See Lautenberg Foundation v. Madoff, 2009 WL 2928913, at *17-18 (D.N.J.), which summarizes the two states' laws as follows:

Under New York law, a claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach. Similarly, under New Jersey law, one who knowingly aids and abets the agent of another in breach of fiduciary duty is liable to the principal. . . . Because both New York and New Jersey law require that a defendant "knowingly" aid and abet a breach of fiduciary duty, the Court discerns no true conflict, (internal quotations and citations omitted).
[28] The DPM Defendants' brief states the general point that actual knowledge must be alleged with some particularity, but the argument in the brief goes to proximate cause/substantial assistance. The exception is with respect to Mellon, discussed in text infra.

In any case, for the reasons discussed with respect to Aaron, the Plaintiffs have sufficiently alleged that Castranova and DPM had actual knowledge of the underlying breaches.
[29] Aaron's challenges to the inference that can be derived from the motive to sell DPM are discussed in the section on fraud, supra, as they apply to Castranova as well, and both of the Individual Defendants challenge fraudulent intent.
[30] As Judge Kaplan recognized in Fraternity Fund, "there is some debate about whether proximate cause and substantial assistance ought to be equated in the aiding and abetting context." But most case law in the Second Circuit requires a showing of proximate cause for an aiding and abetting claim. See, e.g., Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC, 446 F.Supp.2d 163, 201 (S.D.N.Y.2006).
[31] As noted in the discussion of breach of fiduciary duty, questions of proximate cause are ordinarily for the factfinder.
[32] The Plaintiffs also allege interference with the contractual relationship between the Assignors and SPhinX and PlusFunds. But as recounted above, the claims by the Assignors have been dismissed by order of Judge Rakoff on standing grounds, so they will not be considered here.
[33] The Plaintiffs cite Roselink Investors, LLC v. Shenkman, 386 F.Supp.2d 209, 228 (S.D.N.Y.2004), but only for the elements of the cause of action for tortious interference; and in fact the claim in that case was dismissed. They cite Kirch, supra, but again only for the elements of the cause of action; and Kirch is a case in which the defendant was alleged to have induced a breach of a contract in order to obtain a business advantage against the plaintiff. They cite Petkanas v. Kooyman, 303 A.D.2d 303, 305, 759 N.Y.S.2d 1 (1st Dept.2003), but that was a case involving an intentional termination of the plaintiff's employment contractnot a case in which the breach was a collateral effect of any misconduct.
[34] In addition, the claim for tortious interference against Mellon should be dismissed for reasons previously expressed supra, including: 1) Mellon was not a party to, and did not assume the obligations of, the Service Agreement; 2) Mellon cannot be held liable vicariously for the acts of DPM; and 3) there is no ground for piercing the corporate veil.
[35] Aaron argues that a tortious interference claim can only lie against a non-party to the contract, and as he was a director of SPhinX, and therefore its agent, he was not a non-party to the IMA or the prospective contract with Lehman. See Roselink Investors, L.L.C v. Shenkman, 386 F.Supp.2d 209, 228 (S.D.N.Y. 2004) ("For an agent of a party to the contract to qualify as a third party, the plaintiff must demonstrate that the agent acted outside the scope of his authority, or committed an independent tortious act against the plaintiff. A corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party.") (citations and internal quotations omitted). Because the tortious interference claims should be dismissed against all Defendants, it is not necessary to determine if Aaron is entitled to an "agency" protection. But if the court were to reach that issue, the Special Master notes that the "agency" protection does not apply if the defendant was acting for his personal gain rather than for the corporate interest. Petkanas v. Kooyman, 303 A.D.2d 303, 759 N.Y.S.2d 1 (1st Dept. 2003). In this case the Plaintiffs do plead with particularity and with articulation of motivethat Aaron was acting for personal gain. See, e.g., FAC ¶¶ 25-26. Therefore, if the issue is reached, the Special Master would recommend that the claim for tortious interference against Aaron should not be dismissed on the ground that he was only an agent of SPhinX and therefore could not be a non-party to the IMA or Lehman prospective contract.
[36] The parties do not indicate that there is any actual conflict between New York and New Jersey law with respect to fraud. Compare Blank v. Baronowski, 959 F.Supp. 172, 177 (S.D.N.Y.1997) (to prove a fraudulent misrepresentation under New York law, a plaintiff must show that: (1) the defendant made a material false statement; (2) the defendant intended to defraud the plaintiff thereby; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance), with Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350, 367 (N.J.1997) (the five elements of common-law fraud are: (1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages). Therefore, the Special Master concludes that New York law should apply to the claims of fraud. See Schwartz v. Hilton Hotels Corp., 639 F.Supp.2d 467, 471 (D.N.J.2009) ("If there is no actual conflict, then the choice-of-law question is inconsequential, and the forum state applies its own law to resolve the disputed issue.").
[37] For reasons that should be apparent by now, the fraud claims against Mellon are treated separately, below.
[38] DPM Defendants, referring to Rule 9(b), state: "While the `element of actual knowledge may be alleged generally, [a] plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge underlying the fraud.'" (Supplemental Letter to Special Master, Jan. 25, 2010, at p. 2).

The Plaintiffs disagree with Defendants' strict reading of Rule 9(b). The Plaintiffs state:
This may have been the standard in the Second Circuit prior to Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); however, this standard no longer applies outside the [PSLRA]. In Iqbal, the Supreme Court held that "Rule 9... excuses a party from pleading ... intent under an elevated pleading standard". Id. at 1954.... With respect to allegations of mental state (knowledge, intent, etc.) the rules require only a statement of "sufficient factual matter" giving rise to a "plausible" inference of the requisite mental state.
(Supplementary Letter to Special Master, Feb. 8, 2010, at p. 2).
The Plaintiffs are correct that "plausibility" is the correct standard. See Iqbal, 129 S.Ct. at 1949 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). However, Rule 9(b) "does not give [plaintiffs] license to evade the less rigidthough still operativestrictures of Rule 8 ... And Rule 8 does not empower [them] to plead the bare elements of his cause of action." Id. at 1954. Post-Iqbal cases caution that knowledge and intent must be pled with an "ample factual basis." See, e.g., Wood ex rel. U.S. v. Applied Research Associates, Inc., 328 Fed.Appx. 744, 747 (2d Cir.2009) ("Thus, although Rule 9(b) permits knowledge to be averred generally, we have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of fraudulent intent. An ample factual basis must be supplied to support the charges.").
[39] The Amended Complaint also alleges reliance by the Investors on the offering memoranda, marketing materials, and financing statements, but these allegations are now irrelevant because the claims of the Investors have been dismissed for lack of standing.
[40] Whether or not each of the individuals specified reasonably relied on the documents specified is ordinarily a factual issue. A plaintiff alleging fraud "under ordinary circumstances, need only plead that he relied on misrepresentations made by the defendant to survive a motion to dismiss since the reasonableness of his reliance implicates factual issues whose resolution would be inappropriate at this early stage" Internet Law Library, Inc. v. Southridge Cap. Mgmt., LLC, 223 F.Supp.2d 474, 485 (S.D.N.Y.2002).
[41] Another indication of knowledge lies the alleged attempt to alter the Service Agreement to remove the provisions that most directly pertained to the obligations to keeping the cash in segregated accounts. FAC ¶¶ 121-22. That alleged attempt raises a plausible inference that Aaron and DPM knew about the underlying wrongdoing.
[42] Aaron argues that Aaron's deposition testimony can be interpreted differently than the Plaintiffs interpret it, but this is another question of fact that should not be addressed on a motion to dismiss.
[43] Cases like Click v. Berk & Michaels, P.C., 1991 WL 152614 (S.D.N.Y.1991), cited by Aaron, are distinguishable, because the complaint in those cases simply alleged that "defendants" engaged in certain fraudulent activity. The plaintiffs there did not allege that identified defendants worked together to prepare collective statements. See also Filler v. Hanvit Bank, 2003 WL 22110773 (S.D.N.Y. 2003) (broad allegation that the "banks" engaged in acts and statements to defraud). Butala v. Agashiwala, 916 F.Supp. 314 (S.D.N.Y. 1996), also cited by Aaron, is distinguishable, because the allegedly fraudulent statements were oral representations, and the complaint did not identify the speakers who made them.

The cases cited by DPM are equally distinguishable. In Rolo v. City Inv. Co. Liquidating Trust, 155 F.3d 644, 659 (3rd Cir.1998), the plaintiffs failed to allege that any identified defendant helped to prepare the fraudulent statements. In In re NorVergence, Inc., 384 B.R. 315, 363-364 (Bkrtcy.D.N.J.2008), the court rejected the claim that the plaintiff's fraud allegations lumped the defendants together. It noted that the plaintiffs had "provided a detailed account of the alleged fraudulent scheme in ¶¶ 24-46, described Nortel's participation in the scheme ¶¶ 16, 20, 27, 32 and identified certain information which Plaintiff claims should have been disclosed in ¶¶ 37, 38").
[44] The Special Master recommends dismissal of the breach of fiduciary duty claim against Castranova, but that is because the Plaintiffs did not sufficiently plead a relationship of trust and confidence. Assuming the truth of the allegations that Castranova participated in the preparation of the marketing materials, financial statements, and weekly risk reports, the causative effects of the misrepresentations in those documents is sufficiently pled, as indicated in the section on the breach of fiduciary duty.
[45] If the Court were to disagree and find that the Plaintiffs have stated a cause of action for tortious interference, then it would appear that the aiding and abetting allegations should be sustained as wellas to all Defendants except Mellonas they are grounded on the same allegations of knowledge and substantial assistance as support the claims for aiding and abetting breach of fiduciary duty. See the discussion of aiding and abetting breach of fiduciary duty in Section IV F, supra.
[46] The interstate commerce test is minimal, and use of the U.S. Postal Service is sufficient. Maxim Sewerage Corp., 640 A.2d at 1220 n. 2. The Defendants do not contest the Plaintiffs' pleading of the interstate commerce element.
[47] A few cases, such as Royale Luau Resort, LLC v. Kennedy Funding, Inc., 2008 WL 482327 (D.N.J.), are to the contrary and apply the Enright rule to a NJRICO claim. Royale Luau Resort relies on three cases to support its application of the Enright rule; however, the reliance appears to be misplaced. The first case cited is Elysian Fed. Sav. Bank v. First Interregional Equity Corp., 713 F.Supp. 737, 757 (D.N.J. 1989), which analyzes the federal statute and was written before the New Jersey Supreme Court explicitly departed from the Enright rule in Ball. The other cases cited are Longmont United Hosp. v. Saint Barnabas Corp., 2007 WL 1850881, at *10 (D.N.J.) and South Broward Hosp. Dist. v. MedQuist Inc., 516 F.Supp.2d 370, 389-90 (D.N.J.2007), both of which are inapplicable because they are federal RICO cases.
[48] There appears to be no New Jersey RICO cases discussing or applying the "proximate cause" requirement. Therefore, parallel federal case law is a proper source for interpreting proximate cause under NJRICO. See Ford Motor Co., 2009 WL 150951 (applying federal RICO proximate cause standards to a claim under NJRICO).
[49] The Supreme Court identified three rationales for the directness requirement: (1) "First, the less direct an injury is, the more difficult it becomes to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." (2) "Second, quite apart from problems of proving factual causation, recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." (3) "[D]irectly injured victims can generally be counted on to vindicate the law." Id., 503 U.S. at 269-270, 112 S.Ct. 1311.
[50] The Defendants rely on Zavala v. Wal-Mart Stores, Inc., 447 F.Supp.2d 379, 388 (D.N.J. 2006), where the court found proximate cause lacking where documented workers alleged that, as result of the employer's predicate immigration violations, their employer obtained their labor below legally mandated rates. Assuming that Zavala is correctly decided, it is not dispositive of the proximate cause question in this case. Here the Plaintiffs allege that the Defendants' fraudulent misrepresentations were themselves injurious because they prevented the innocents at SPhinX and PlusFunds from knowing that the excess cash was unprotectedand it is the transfer of excess cash to unprotected accounts that is the injury in this case. The Defendants are not accused of doing a predicate act to "soften up" the plaintiff so that another act can be done to injure them which was the case in Zavala.
[51] The use of the mails does not need to be a crucial element of the scheme, as long as the mailings are "`incident to an essential part of the scheme.'" Emcore Corp., 102 F.Supp.2d at 245 (quoting Schmuck v. United States, 489 U.S. 705, 710-11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989)). Also, each mailing is a new violation. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1413 (3rd Cir.1991).
[52] The discussion in the fraud section also reviews SPhinX marketing materials, which are not included in the RICO count as predicate actsbut the discussion of the financial statements and weekly risk reports indicates that the Plaintiffs have sufficiently alleged that all Defendants other than Mellon knowingly prepared specific false statements, at designated times, to the effect that SMFF's excess cash was not at risk when in fact it was.
[53] Of course for reasons discussed above, the conspiracy claim against Mellon should be dismissed with prejudice even if the court were to find that the Plaintiffs have sufficiently pled the NJRICO conspiracy as to the other Defendants.
[54] To reiterate, neither the Special Master nor the Court has yet considered the motions to dismiss insofar as they are brought on Wagoner/in pari delicto grounds. So a recommendation that a motion to dismiss be denied is not intended to dispose of the Wagoner/in pari delicto questions that will be treated in a subsequent R and R.